DEAN C. DAUW, Plaintiff-Appellant, *v.* FIELD ENTERPRISES, INC., *et al.*, Defendants-Appellees.

First District (3rd Division)    No. 78-2127

Opinion filed October 17, 1979.

Earl G. Schneider, of Chicago, for appellant.

Ronald G. Zamarin and Pamela Bristow Strobel, both of Chicago, for appellees.

Mr. PRESIDING JUSTICE SIMON delivered the opinion of the court:

The Chicago Sun-Times published a series of articles growing out of an investigation of executive counseling agencies. The subject of one of the articles, Dean C. Dauw, sued the newspaper and its reporter for libel. The amended complaint was dismissed for failure to state a cause of action. Because the article may be interpreted in a way that does not defame Dauw, the "innocent-construction rule" requires that the dismissal be affirmed.

Dauw claims that the article, which appeared under the headline "Executive Recruiter Pledges Much—And Keeps The Fee," read as a whole depicts him in a defamatory manner. We, therefore, feel it is necessary to set forth the entire publication. It read:

"HI, MY NAME IS DEAN.

I looked up a steep stairway in a renovated brownstone at 112 W. Oak. At the top of the stairs stood a serious looking, slightly stocky man with a graying goatee, Dean C. Dauw, PhD, a psychologist.

Dauw learned the executive-consulting business by working for firms similar to Executive Careers Inc., which promised, for fees of several thousand dollars, to help executives and would-be executives into high-paying jobs.

Executives Careers closed after a Sun-Times investigation of its practices and legal action brought by the consumer fraud division of the Illinois attorney general's office.

Dauw said he didn't work for Executive Careers but refused to name the companies he worked for because he said they had bad reputations.

I was visiting Dauw posing as a prospective customer during a five-month investigation of executive consulting firms.

He held a folder in one hand. 'I've been expecting you,'he said. As I made my way up the stairs I explained that he must be expecting someone else as I had dropped in without an appointment.

I inquired about job counseling as advertised under the name Human Resource Developers Inc. Dauw looked distressed. 'You really should have an appointment,' he said. 'We're awfully busy. Just a minute, I think you're in luck. I'll have a consultant available in a minute. I'll give you some material to read and put you in an office.'

He bustled about from file cabinet to closet gathering brochures.

'Go on upstairs and knock on the first door and tell her I told you to sit in an office,' he said.

I made my way up more stairs and knocked at a door. A young woman answered (I later learned her name was Kathy McHugh) and showed me to another room.

Kathy pointed to a gray sofa and I sat down. The door closed and I looked around. The room was opulently appointed with a red rug, red-flocked velvet wallpaper, red drapes. The furniture was antique and under a folding desk was a box from a moving company marked 'red.' This must be the red room.

The sofa on which I sat was surrounded by mirrors on three sides—to the right, to the rear and overhead on the ceiling. I couldn't help thinking what an aid this would be to another side of Dauw's work—sex counseling.

Much of this work involves men who are impotent or have problems with premature ejaculation. Dauw frequently supplies women for these men to practice on. They are not prostitutes but are called sex surrogates and are absolutely necessary to the treatment, according to Dauw.

I looked through the material I had been given and saw that Dauw is associate professor in the graduate school of business at DePaul University.

Later, Kathy came in and took me out of the red room to another room down the hall decorated entirely in blue. She told me about the job-counseling program. I would get tests to take home to help them decide what I should do, I would have resumes printed up and I would be coached on how to handle interviews.

'How old are you'?' she asked.

'Thirty-nine.'

A look of consternation passed across her face. 'Research shows that a person who is plus-40 runs into all sorts of difficulties,' she said.

Kathy asked if I had a resume and I said, no. But she went on: 'Because of the fact that you have a sophisticated resume and because of the fact that you handle yourself well in an interview situation the salary you will be making will be commensurate with what you are making and you can go beyond that.'

Kathy produced a newspaper and showed me some ads. 'Right now there are five other organizations in the city that do what we do,' she said.

One ad she pointed was for a firm called Richard Allen Winter. Some clients of that firm have complained that, for fees of up to $2,500, all they get are a few tests, a resume and a list of companies to send the resumes to.

Then she handed me a binder with the name Executive Careers

Inc. on it. The binder contained a job-search program with a price tag of $2,750.

Kathy seemed unaware that Executive Careers had closed.

She said that Dauw would do the same kind of job for me as Richard Allen Winter, Executive Careers and other firms, but would only charge $795.

Kathy handed me a guarantee. The first thing the guarantee promised was to provide consultation for as long as necessary. Clients of Richard Allen Winter, Executive Careers and other firms have complained that this type of guarantee is used against them—when the clients complain that they are not getting any results, the firms tell them they are not working hard enough.

The guarantee also promised: 'Clients who follow our advice ALWAYS get jobs.'

The guarantee however, promises that clients will never see their money again: 'Once a client has paid a consulting fee, for counseling services rendered, it is not refundable on the pretext the client merely arbitrarily changes his-her mind.'

'We have built up a number of good contacts that are looking for people like you,' she said.

She said that Dauw had started at one of the competitors listed in the newspaper ads. 'The idea is that he was working with one of our competitors—he wasn't even there three months and he decided he could do it more efficiently for less cost to you, the consumer, and do a better job. . .'

In a piece of Dauw's literature, the question is asked, 'How do we know you are an accredited organization?' The answer given is that Dauw and others belong to professional organizations and 'Our president is executive director of the International Assn. of Executive Consultants.'

In a telephone interview later, Dauw admitted the association no longer exists. It was pointed out that Jack Burke, president of the defunct Executive Careers, had organized an association with the same name.

Dauw accused Burke of 'plagiarizing' and stealing the idea from him.

Dauw refused to name the executive-guidance firms he had worked for. 'I don't want any publicity given to bad people,' he said, 'and there are an awful lot of bad people in the field of career counseling.' "

■■ The innocent-construction rule has long been entrenched in defamation suits in Illinois. (See *Crosby v. Time, Inc.* (7th Cir. 1958), 254 F.2d 927, and cases cited therein; *Young v. Richardson* (1879), 4 Ill. App.

364.) As enunciated by the supreme court in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 181 N.E.2d 105, the rule holds:

> "[T]hat the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." (*John*, 24 Ill. 2d 437, 442.)

Whether the words may reasonably be construed innocently is a question for the court. *Valentine v. North American Co.* (1974), 60 Ill. 2d 168, 328 N.E.2d 265; *Belmonte v. Rubin* (1979), 68 Ill. App. 3d 700, 701, 386 N.E.2d 904.

Although no court in Illinois has undertaken a discussion of the policies which support the innocent-construction rule, and although the overwhelming majority of other jurisdictions have chosen not to adopt it (see Prosser, Torts §111, at 747-48 (4th ed. 1971); Restatement (Second) of Torts §614 (1977)), the rule has a long history. Originally adopted in England as the doctrine of "mitior sensus," the rule is that when the words which form the heart of a defamation suit can be given two or more meanings, one of which is favorable and not defamatory, the court will construe the words in the favorable sense. See *Case of the Lord Cromwell* (1577), 4 Coke Rep. 12b, 76 Eng. Rep. 877, cited in Kalven, Gregory & Epstein, Torts 994-96 (3d ed. 1977).

■■ The rule of innocent construction has the desirable benefits of encouraging the robust discussion of daily affairs (*cf. New York Times v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710), as well as of reducing litigation. "The law of libel does not provide redress for every expression of opinion touching on a person's capabilities or qualifications * * * no matter how much the complained of statement may injure the subject person in his own conception." *Anderson v. Matz* (1978), 67 Ill. App. 3d 175, 178, 384 N.E.2d 759, 761.

The innocent-construction rule also comports with constitutional concerns about encouraging free expression. Regardless of the standard of liability a State may apply in defamation actions, the first amendment forbids any private libel action against a media defendant unless the defendant's editors have been put on notice at the time of dissemination that their publication could be held defamatory. (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 348, 41 L. Ed. 2d 789, 810, 94 S. Ct. 2997, 3011.) Illinois has chosen a standard of negligence. (*Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292.) The innocent-construction rule insures that no article will be held libelous unless the editors know that the only reasonable interpretation which can be given to their article is defamatory.

■■ In operation, the rule requires that the headline and the body of the

story at issue be read together (*Reed v. Albanese* (1966), 78 Ill. App. 2d 53, 223 N.E.2d 419), stripped of all innuendo urged by the parties (*Zeinfeld v. Hayes Freight Lines, Inc.* (1969), 41 Ill. 2d 345, 347-48, 243 N.E.2d 217; *Belmonte v. Rubin* (1979), 68 Ill. App. 3d 700, 701, 386 N.E.2d 904, 905), and taken instead in their best possible sense (*Wexler v. Chicago Tribune Co.* (1979), 69 Ill. App. 3d 610, 613, 387 N.E.2d 892, 894). The issue of construction may be raised by a motion to dismiss. (*Kilbane v. Sabonjian* (1976), 38 Ill. App. 3d 172, 177, 347 N.E.2d 757.) As in any case of construction, each case must be decided on its own facts. *Korbar v. Hite* (1976), 43 Ill. App. 3d 636, 639, 357 N.E.2d 135, *cert. denied* (1977), 434 U.S. 837, 54 L. Ed. 2d 98, 98 S. Ct. 127.

The dispute in this case is over what the article meant when viewed from the perspective of the innocent-construction rule. The plaintiff pointed to no misstatements of fact in the story, but alleged that readers would reasonably understand the article to mean that it was the practice of Dauw's counseling service to "make unlikely promises to their clients and then arbitrarily refuse to refund the clients' fee when and if said clients were reasonably dissatisfied and/or said promises went unfulfilled." The plaintiff also complained of being identified with other executive counseling services which had been the subject of earlier articles in the Sun-Times series, and of the overall characterization of Dean C. Dauw as an unsavory individual.

■ Applying the innocent-construction rule to his article, we find that the Sun-Times story was not defamatory. Every assertion about the plaintiff, including the summaries of his guarantee, was taken either from Dauw's own words or from the brochure handed to the reporter by an employee of the firm, and the plaintiff does not point to a single untruthful statement or inaccurate quotation. The careful and reasonable reader looking at the actual terms of Dauw's guarantee would not draw the defamatory conclusion that the plaintiff asserts. It would be unreasonable to conclude that the guarantee prepared by Dauw himself would defame him. Similarly, while Dauw complains of being discussed in the same newspaper series with other executive counseling firms against whom legal action had been taken, the article did recite the plaintiff's own assertions that he and his firm were different from their competitors. Dauw did not deny that he had worked for other firms in the field, firms that may have been unethical, but the fact that Dauw himself conceded that some of his competitors had bad reputations did not establish that Dauw had a similar reputation. Once the plaintiff's own words disassociated him from his competitors, an innocent construction of the article would not allow for "defamation by association."

■ A publication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of his community or to deter

third persons from dealing with him. (*Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 340, 207 N.E.2d 482, 484.) When the article is read as a whole and innocently construed, it does not depict Dauw as an unsavory individual. Rather, Dauw's own statements, the statements of his employee, and the printed material that Dauw prepared left the reasonable impression that he was a business person actively seeking to attract customers. As a matter of law, the article was not defamatory. The trial court was therefore correct in dismissing the plaintiff's complaint for failure to state a cause of action for libel.

Judgment affirmed.

McNAMARA and RIZZI, JJ., concur.