GEORGE O. NEWELL, Plaintiff-Appellant, *v.* FIELD ENTERPRISES, INC., Defendant-Appellee.

First District (5th Division)   No. 79-999

Opinion filed December 12, 1980.

Deborah A. Sperlak, of Krebs & Langowski, of Chicago, for appellant.

A. Daniel Feldman, Ronald G. Zamarin, and Steven R. Gilford, all of Isham, Lincoln & Beale, of Chicago, for appellee.

Mr. JUSTICE LORENZ delivered the opinion of the court:

In this appeal we face several issues involving both fundamental principles of common law libel and constitutional limitations, imposed under the first amendment, on the liability of the press for libel. Plaintiff, George Newell, alleged that a newspaper article, printed in the Chicago Daily News and published by the defendant Field Enterprises, Inc., contained defamatory statements about him. The article purported to be a summary of a civil complaint in a wrongful death action brought against Newell. In granting summary judgment for defendant, the trial court stated that the article was a fair and accurate report on a judicial proceeding and was published without malice. Consequently, the trial court ruled that the common law privilege to report on judicial proceedings protected defendant from liability. Plaintiff appeals.

On January 18, 1976, Joan Marie Dini died in a fire in the home of George and Kathleen Newell. The estate of Joan Marie Dini filed a wrongful death action against the Newells on September 29, 1976. The two-count complaint alleged that the Newells kept gunpowder and other incendiary materials in their home. On January 17, 1976, George Newell installed an oil-burning lamp in the family room of the house. Joan Marie Dini was an overnight guest of the Newells that night. She slept in the upstairs master bedroom, while George Newell slept on the living room couch in the family room on the first floor. Before going to sleep, George Newell filled the oil lamp and lit it. During the night a fire broke out, and the heat and the smoke from the fire woke George Newell. To insure clarity, a summary of the remainder of the complaint will not suffice; therefore, several allegations must be repeated verbatim here:

"Defendant George O. Newell, upon discovering the fire, made efforts to save his pet parrot from the fire and attempted to put out the fire by tearing down the curtains which were in flames.

Defendant George O. Newell made no immediate attempt to reach decedent [Joan Marie Dini], to wake her directly or to help her escape from the fire, despite the fact that the bedroom in which decedent was asleep at the time was above the location of the fire visible to defendant George O. Newell.

Defendant George O. Newell removed his pet parrot from the family room to another room in the home, went outside the home to get fresh air and escape the heat and smoke then filling the home, returned to a separate part of the home to telephone the fire department, and removed the parrot to outside the home, but did not reach or assist the decedent in any way.

Defendant then attempted, from outside the home, to break a window in the upstairs master bedroom by throwing snowballs in order to attract decedent's attention to the windows because

defendant knew that the windows were entirely draped on the inside and obscured from decedent's view from within the bedroom.

As a direct and proximate result of the aforesaid negligence of defendants, decedent then and there sustained severe injuries from the fire and resulting heat and smoke, of which she died on January 18, 1976 * * *."

Count II of the complaint, containing essentially the same factual allegations as count I, rests on defendants' negligence in allowing a fire to start in their home.

One day after this complaint was filed, the Chicago Daily News ran an article capsulizing the allegations of this complaint. The article appeared on the top of the last page of section one of the newspaper and was set off from other articles on the page by double black lines. The headline of the article, consisting of dark black letters approximately one-quarter inch high, read: "SAVED PARROT, LET WOMAN DIE, SUIT SAYS." The article stated:

"A Glenview man has been accused in a damage suit of saving his parrot from his burning home while making no effort to rescue a young woman who was staying there.

The charge was included in a $400,000 negligence suit filed in Circuit Court Wednesday against George and Kathleen Newell, who lived at 1043 Queens Lane at the time of the fire.

The suit was filed on behalf of the estate of Miss Joan Marie Dini, 20, of 619 Gunderson, Carol Stream, who died as the result of injuries from the fire.

THE COUPLE is charged with having 'gun powder and other flammables' in their home which contributed to the fire.

The suit alleges that before the fire on January 17, Newell had filled an oil-burning lamp in the home and left it burning. The lamp was near some curtains in the family room of the home, the suit says.

When the fire broke out, Newell rescued his parrot, but did not attempt to rescue Miss Dini from an upstairs bedroom in the home, the suit charges.

Miss Dini's survivors include her father, Raymond J.; mother, Marie; a sister and four brothers."

Plaintiff's amended two-count complaint alleges that defendant maliciously published the above article which contained "inaccurate, untrue and libelous" statements about him. Plaintiff further alleged: "That defendant knew or ought to have known that the aforesaid [the article] was false, and made and published same with such knowledge. Furthermore, defendant either did not believe in the truth of said defamatory

statement or same was published with reckless disregard of the truth, and in the publication of said statement showed actual malice toward plaintiff." As a result of this article, plaintiff was held up to "public hatred, ridicule, and contempt and by means of said publication, plaintiff has suffered injury to his good name, reputation, standing in the community, personal humiliation, mental anguish and suffering." Consequently, plaintiff seeks recovery for compensatory and punitive damages.

Count II of plaintiff's complaint differs from count I only in its expression of defendant's wrongful conduct. According to count II, defendant "knew or ought to have known that the aforesaid was false, and it made and published same with such knowledge. Furthermore, defendant either did not believe the truth of said defamatory statement or if it did, had no reasonable grounds for so believing. In addition, defendant did not make a reasonable investigation into the accuracy and truth of the statement, or did it in such a negligent manner as to cause plaintiff great damage to his reputation." In count II, plaintiff seeks only compensatory damages for the injuries he sustained. The crucial difference between these two counts is that count I bases defendant's liability on actual malice (see *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710), while count II is predicated upon ordinary negligence.

After filing its answer, defendant moved for summary judgment on several grounds. First, defendant maintained that the article carries no libelous meaning. Second, the article is not actionable as libel because of the application of the innocent construction rule. Third, the article is protected under the common-law privilege to report on judicial proceedings. Fourth, the article is protected by the freedom of the press guarantee of the first amendment. (U.S. Const., amend. I.) Fifth, the complaint fails to state a cause of action upon which relief may be granted. In support of its motion, defendant filed the affidavit of the reporter, Saundra Saperstein, who wrote this article. The Saperstein affidavit states that the sole source for her article was the complaint filed by the estate of Joan Marie Dini. She had no knowledge that anything in the complaint was false, and did not know George Newell.

Plaintiff also filed a motion for summary judgment with supporting affidavits. These affidavits by persons who knew George Newell essentially stated that, in their opinion, prior to the date of the Chicago Daily News story, Newell enjoyed a good name and reputation and was held in high esteem. An affidavit by George Newell was also filed. This affidavit described the various injuries incurred by Newell as a result of the article. As one of these injuries, Newell stated that he lost four business customers because of the article.

On October 20, 1977, the trial court denied both motions for

summary judgment. Both parties moved for reconsideration of this order, and on March 6, 1979, the trial court granted defendant's motion for summary judgment.

The right to summary judgment must be clear beyond question, and when deciding this question, a court must construe the pleadings, depositions, and affidavits most strongly against the moving party and most liberally in favor of the opponent. (*Baier v. State Farm Ins. Co.* (1975), 28 Ill. App. 3d 917, 329 N.E.2d 543, *aff'd* (1977), 66 Ill. 2d 119, 361 N.E.2d 1100.) On appeal from an order granting summary judgment, the reviewing court must consider all grounds and facts urged below to determine if a genuine issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law. (*Welch v. Chicago Tribune Co.* (1975), 34 Ill. App. 3d 1046, 340 N.E.2d 539.) For the reasons stated below, we feel that the trial court improperly granted summary judgment to defendant on the basis of a common law privilege to report on judicial proceedings. We must, however, discuss each of the other grounds raised by defendant, which could support the trial court's order.

■■ A statement is defamatory if it impeaches a person's integrity, virtue, human decency, respect for others or reputation and thereby lowers that person in the estimation of the community or deters third parties from dealing with that person. (*Cerveny v. Chicago Daily News Co.* (1891), 139 Ill. 345, 28 N.E. 692; *Dauw v. Field Enterprises, Inc.* (1979), 78 Ill. App. 3d 67, 397 N.E.2d 41.) No general rule or principle constitutes an accurate test for determining whether language is defamatory; each case must be decided on its own facts. (*Bruck v. Cincotta* (1977), 56 Ill. App. 3d 260, 371 N.E.2d 874.) Defamatory writing is classified either as libel per se or per quod. (*Bruck v. Cincotta.*) Libel per se is generally defined as words so obviously and naturally hurtful to the person that proof of their injurious character can be, and is, dispensed with. (*Reed v. Albanese* (1966), 78 Ill. App. 2d 53, 223 N.E.2d 419.) Over the years, the Illinois courts have discerned four categories of words which constitute libel per se: (1) those imputing the commission of a criminal offense; (2) those imputing infection with a communicable disease of any kind which, if true, would tend to exclude one from society; (3) those imputing inability to perform or want of integrity in the discharge of duties of office or employment; and (4) those prejudicing a particular party in his profession or trade. (*Bontkowski v. Chicago Sun-Times* (1969), 115 Ill. App. 2d 229, 252 N.E.2d 689.) Having found a writing to be libel per se, malice and damages will be presumed. *Lorillard v. Field Enterprises, Inc.* (1965), 65 Ill. App. 2d 65, 213 N.E.2d 1.

A writing constitutes libel per quod if it requires an innuendo to give

it a libelous meaning. (*Bruck v. Cincotta* (1977), 56 Ill. App. 3d 260, 371 N.E.2d 874.) To sustain an action for libel per quod, plaintiff must allege and prove special damages. (*Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482.) The categorization of libel as per se or per quod and the strict requirements for each have been established in the interest of protection of free speech. See *Whitby v. Associates Discount Corp.*

In its motion for summary judgment, defendant contended that this action is not maintainable either as libel per se or libel per quod. Plaintiff initially responded that the article is libelous per se because it imputes that he committed the crime of involuntary manslaughter (Ill. Rev. Stat. 1977, ch. 38, par. 9—3), by allowing Joan Marie Dini to die in the fire. In determining whether a writing constitutes libel per se as imputing the commission of a crime, the words must be taken in the sense which readers of common and reasonable understanding would ascribe to them and must be construed in the context of the entire article. (*Lorillard v. Field Enterprises, Inc.* (1965), 65 Ill. App. 2d 65, 213 N.E.2d 1.) For words imputing the commission of a crime to be libelous per se, the offense must be indictable, involve moral turpitude and be punishable by death or imprisonment rather than by a fine. (*Bruck v. Cincotta.*) The writing, however, need not state the commission of a crime in terms of art or with the particularity of an indictment. *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 243 N.E.2d 217.

■■ The article in question does not impute the commission of a crime and therefore is not libelous per se. First, the article clearly states that Newell is only charged with a civil wrong in a damages suit. Next, the article specifically describes the Dini suit against Newell as an action for damages based on negligence. Finally, the article cannot be read, even in a general manner, as imputing to Newell an act of reckless conduct, an essential element of the offense of involuntary manslaughter (Ill. Rev. Stat. 1977, ch. 38, par. 9—3), causing the death of Joan Marie Dini. Rather, the article clearly implies that Newell's conduct in permitting fire-hazard type conditions to exist in his home was negligent, and that his failure to make any attempt to save Ms. Dini, or at least to warn her of the fire, was both contemptible and irresponsible. In addition, the article imputes that Newell, acting on an unusual and socially intolerable set of priorities, chose to save his pet parrot rather than another human being. The article does not, however, charge Newell with an act of reckless conduct.

Defendant also contended that the article does not constitute libel per quod. According to defendant, the article carries no libelous meaning, and if a libelous meaning can be found, application of the innocent construction rule will render the article nonactionable. Plaintiff, of course,

disagreed. He maintained that the article was libelous of his respect for the sanctity of human life and that the doctrine of innocent construction is inapplicable.

■■ The article in question is libelous because it impeaches plaintiff's respect for human life and thus acts to lower him in the estimation of the community and to deter third persons from dealing with him. (*Cerveny v. Chicago Daily News Co.* (1891), 139 Ill. 345, 28 N.E. 692; *Dauw v. Field Enterprises, Inc.* (1979), 78 Ill. App. 3d 67, 397 N.E.2d 41.) In reaching this decision, we are aware that the defamatory effect of a writing is "to be ascertained not from the viewpoint of a critic or language expert, but rather from that of a reader of reasonable intelligence who takes ordinary interest in the articles of a periodical but does not commonly subject them to careful scrutiny and analysis." (*Christopher v. American News Co.* (7th Cir. 1948), 171 F.2d 275, 278.) We also note that the question of determining whether a writing is libelous is a question of law. (*von Solbrig Memorial Hospital v. Licata* (1973), 15 Ill. App. 3d 1025, 305 N.E.2d 252.) Our finding of a libelous meaning rests on three statements contained in the article. First, the article implies that Newell created fire-hazard type conditions inside his home by having "gunpowder and other flammables" inside the home and by lighting an oil-lamp, located on a wall near the curtains in the family room, before going to sleep. Second, the article states that Newell made no effort to attempt to save Joan Marie Dini or to warn her of the fire. Third, the article, by the headline, states that Newell made a voluntary choice to save the life of his parrot rather than the life of another human being. Thus, the article defamed plaintiff by impeaching his respect for human life.

Defendant, however, also contended that the article carries a nonlibelous interpretation, and therefore is nonactionable under the innocent construction rule. Our supreme court explained this doctrine in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442, 181 N.E.2d 105, 108, *cert. denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148, when it said:

> "That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law."

Although defendant has offered an explanation of the article which shows that it does not portray the commission of a criminal offense by Newell—a conclusion we share—defendant has offered no plausible alternative interpretation which would not be libelous of plaintiff. Moreover, we have concluded that the article is libelous per quod because it denigrates plaintiff's respect for human life. The rule of innocent con-

struction, therefore, provides no sanctuary for this defendant. See *Catalano v. Pechous* (1980), 83 Ill. 2d 146, ___ N.E.2d ___.

■■ In its brief before this court, defendant argues that plaintiff cannot sustain an action for libel per quod because of his failure to allege special damages in his complaint. (See *von Solbrig Memorial Hospital v. Licata* (1973), 15 Ill. App. 3d 1025, 305 N.E.2d 252.) Our review of the record reveals that special damages were not pleaded by plaintiff in his complaint. As pointed out by plaintiff, however, defendant completely failed to attack this defect in the court below. Defendant's remedy was to challenge this defect in a motion to dismiss. (See Ill. Rev. Stat. 1977, ch. 110, par. 45.) Section 42(3) of the Civil Practice Act emphatically states: "All defects in pleadings, either in form *or substance*, not objected to in the trial court are waived." (Ill. Rev. Stat. 1977, ch. 110, par. 42(3).) (Emphasis added.) Consequently, defendant may not raise this issue for the first time on appeal. (*Third Swansea Properties, Inc. v. Ockerlund Construction Co.* (1976), 41 Ill. App. 3d 894, 354 N.E.2d 148; *Swiontek v. Greenstein* (1961), 33 Ill. App. 2d 355, 179 N.E.2d 427.) This is especially true when, as here, the complaint could have been amended to include special damages. Plaintiff's affidavit, in connection with the various motions for summary judgment, stated that as a result of this article he lost several business customers which he named. On this basis alone, plaintiff could have amended his complaint to include special damages had this issue been raised in the trial court. Knowing this, we conclude that defendant has waived this argument for appeal.

■■ Defendant also sought protection from liability under the common law privilege to report on judicial proceedings. It was on this ground that the trial court granted summary judgment for defendant. Under this privilege, a communication reporting the contents of a judicial proceeding is privileged, although it contains defamatory statements, if it is (a) accurate and complete as a fair summary of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed. (*Lulay v. Peoria Journal-Star, Inc.* (1966), 34 Ill. 2d 112, 214 N.E.2d 746; *Storey v. Wallace* (1871), 60 Ill. 51; see also Prosser, Law of Torts §118, at 831 (4th ed. 1971); Restatement (Second) of Torts §611 (1977).) This privilege was primarily designed to increase the public's knowledge of the judicial system and its operations. Armed with this knowledge, the public is in a better position to assess the value of the present judicial system and its ability to resolve the problems of today's society. (See *Segall v. Lindsay-Schaub Newspapers, Inc.* (1966), 68 Ill. 2d 209, 215 N.E.2d 295.) Additionally, this privilege promotes increased reporting of particular cases which are of interest, for whatever reason, to the public. In our society, the citizenry is ultimately charged with the duty of self-government. As a corollary to this fact, the citizenry has a significant need

to receive information on all fronts on all subject areas. Thus, this privilege acts to fulfill this need by giving the public increased access to information found inside the judicial machinery. Perhaps the public's interest in governmental proceedings, and in particular those of the judicial system, was best expressed by Mr. Justice White in *Cox Broadcasting Corp. v. Cohn* (1975), 420 U.S. 469, 491-92, 43 L. Ed. 2d 328, 347, 95 S. Ct. 1029, 1044-45:

> "[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the best data of government operations. * * * With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."

In response to defendant's interjection of this common law privilege to report on judicial proceedings, plaintiff maintained that (1) the privilege is not applicable to the mere filing of a complaint, but requires some form of judicial action to be a judicial proceeding; (2) the article published by defendant is not a fair and accurate summary of the Dini complaint; and (3) the article was published with the sole intent of harming plaintiff, that is, common law malice. No Illinois court to date has decided whether the privilege to report judicial proceedings extends to the publication of the contents of a complaint before any judicial action has been taken with respect to it.

The majority of jurisdictions has concluded that this privilege does not attach until some form of judicial action has taken place. (*E.g.,* *Sanford v. Boston Herald-Traveler Corp.* (1945), 318 Mass. 156, 61 N.E.2d 5; *Byers v. Meridian Printing Co.* (1911), 84 Ohio St. 408, 95 N.E. 917; see Prosser, Law of Torts §118, at 831 (4th ed. 1971); Restatement (Second) of Torts §611 (1977).) Courts have ·taken this position because of the potential for malicious public defamation, and even extortion, caused by the intentional filing of complaints containing defamatory allegations and then promptly dismissing the suit after it has obtained widespread publication by the media. (See Prosser, Law of Torts §118, at 831 (4th ed. 1971).) According to this view, the court's refusal to attach the common law privilege until after judicial action has occurred cautions the media from repeating the untested allegations of a pleading and thereby reduces the potential for defamation. Underlying this reasoning is the assumption that a suit which is kept alive until judicial action has taken place is

more likely to have been brought as a valid claim for legal redress rather than to obtain publicity for defamatory statements found in the pleadings.

Under the minority view, the common law privilege to report on judicial proceedings attaches not at the point of judicial action, but rather when the complaint is filed. (*E.g., Johnson v. Johnson Publishing Co.* (D.C. App. 1970), 271 A.2d 696; *Raymond Lee Organization, Inc. v. Council of Better Business Bureaus, Inc.* (1973), 74 Misc. 2d 363, 343 N.Y.S.2d 502; *Campbell v. New York Evening Post, Inc.* (1927), 245 N.Y. 320, 157 N.E. 153; *Lybrand v. The State Co.* (1936), 179 S.C. 208, 184 S.E. 580; *Langford v. Vanderbilt University* (1956), 199 Tenn. 389, 287 S.W.2d 32; and *O'Brien v. Tribune Publishing Co.* (1972), 7 Wash. App. 107, 499 P.2d 24, *cert. denied sub nom. O'Brien v. Franich* (1973), 411 U.S. 906, 36 L. Ed. 2d 196, 93 S. Ct. 1531.) Also, in *American District Telegraph Co. v. Brink's Inc.* (7th Cir. 1967), 380 F.2d 131, the Seventh Circuit Court of Appeals decided that if faced with this question the Illinois courts would adopt the minority position. A review of these cases reveals two major reasons for rejection of the general rule: One, the public's interest in being informed on contemporary problems which have entered the judicial system for adjudication outweighs the potential harm which may result to innocent individuals who are defamed by publication of these pleadings. Two, the limitation of judicial action on this privilege, employed by the majority view, is not a meaningful method of reducing the risk of defamation by publication of these pleadings. We also note that since the New York Court of Appeals rejected the majority position in *Campbell v. New York Evening Post* (1927), 245 N.Y. 320, 157 N.E. 153, the trend has been toward adoption of the minority view. (See *O'Brien v. Tribune Publishing Co.*) Today, we join that trend.

· In our opinion, four distinct reasons compel acceptance of the minority position. First, as we noted at the outset of our discussion of this issue, the public's interest in knowing what is taking place inside the judicial system necessitated the creation and promulgation of this privilege. This rationale is even stronger today when an increasing number of society's problems are resolved through the judicial process. Thus, the entire judicial system from the filing of a complaint until final decision before the highest court of review should be exposed to the bright light of public scrutiny. Adoption of the minority position enhances the motivation of the press to report to the citizenry what is transpiring inside the nation's judicial system and how these events may affect their lives. Consistent with these principles, the Supreme Court has said:

> "A trial is a public event. What transpires in the courtroom is public property. * * * Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions

of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." (*Craig v. Harney* (1947), 331 U.S. 367, 374, 91 L. Ed. 1546, 1551, 67 S. Ct. 1249, 1254.) Certainly, the administration of justice is of utmost importance to the citizenry. While we are aware that pleadings are one-sided and may contain, by design, highly defamatory statements, we believe the information found in such pleadings is of sufficient value as to warrant the encouragement of its publication.

Second, the majority position has limited the applicability of this privilege to proceedings in which some judicial action has occurred. This limitation purportedly decreased the risk of publication of pleadings, containing defamatory statements, which were filed with the sole purpose of obtaining publicity in the media. We find this argument unconvincing. At the present time, courts espousing the majority view have found sufficient judicial action in both *ex parte* actions (*Fitch v. Daily News Publishing Co.* (1928), 116 Neb. 474, 217 N.W. 947) and grand jury proceedings (*Schuster v. U.S. News & World Report, Inc.* (8th Cir. 1979), 602 F.2d 850) to render the privilege applicable to these proceedings. In each of those situations the information before the court was essentially one-sided but yet publication of that information was held to be privileged. Moreover, in a grand jury proceeding, the judiciary's role in evaluating factual allegations made by the government is negligible. In our opinion, these cases illustrate the emptiness of the limitation of judicial action employed by the majority view. In *Johnson v. Johnson Publishing* (D.C. App. 1970), 271 A.2d 696, 698-99, the court in rejecting the use of judicial action as a limitation on this common law privilege said:

> "There is always the possibility that groundless suits may be filed and immediately dismissed after the defamatory allegations have been given wide circulation, but the logic of preventing the republication of what may be groundless defamatory allegations of a complaint when filed, yet allowing such republication the moment trial begins or any other judicial action is taken, however slight, is to us totally unconvincing. We therefore follow the minority view that a qualified privilege extends to reports of charges contained in pleadings filed in court."

Simply because a suit has proceeded to the point where judicial action of some kind has taken place does not necessarily mean that the suit is less likely to be groundless and brought in bad faith. In light of the questionable effectiveness of this limitation, we believe the public interest is best served by including within the common law privilege to report on judicial proceedings pleadings upon which no judicial action has been taken.

Third, we believe the general public today is capable of evaluating

the actual worth of information, gleaned from a complaint or preliminary pleading, which has received the attention of the news media. Over the years as the role of the judicial system in our society expanded at a surprising rate, the public, correspondingly, became increasingly aware, through the media, of the actual mechanics of the legal process. As a result of this increased exposure, the public is now aware that a complaint or other pleadings is one-sided and yet to be proven. In fact, this realization about the sophistication of the public was reached by the New York Court of Appeals as early as 1927 in *Campbell v. New York Evening Post* (1927), 245 N.Y. 320, 157 N.E. 153. The court stated:

> "To publish truly and without malice of one that an action has been brought against him for fraud, seduction, assault, breach of promise, divorce, et cetera, has become so common that the opportunity is seldom passed in silence except when forbearance or obscurity protects the victim. So general has this practice become that the public has learned that accusation is not proof and that such actions are at times brought in malice to result in failure. To say that the newspapers may freely publish the entire proceedings in a case from an *ex parte* application for an order of arrest or other remedial process under the protection of privilege, but may speak only at their own risk before the case actually comes before a court or judge in some form, is to make a distinction to which publishers give little heed." (*Campbell*, 245 N.Y. 320, 327, 157 N.E. 153, 155.)

Obviously, these observations made by the *Campbell* court are even more true today when media coverage of judicial proceedings is so widespread. We, therefore, feel that the public will properly scrutinize any republication by the media of defamatory statements found in a complaint before placing any belief in it.

■■ Fourth, the filing of a pleading in a legal proceeding is a public and official act. Under section 16 of "An Act to revise the law in relation to clerks of courts" (Ill. Rev. Stat. 1979, ch. 25, par. 16), all documents, papers, and records filed in the clerk's office are public records and shall be open to inspection by the public at all times. The statute symbolizes the legislature's determination that the public interest is best served by increasing the public's knowledge about what is transpiring inside the judicial process. It bears repeating that the administration of justice in this country is of utmost importance to the citizenry and therefore, a public benefit is performed by reporting judicial proceedings. Consequently, we believe the law should encourage the media, consistent with the goal of informing the public, to use its vast communicative powers to relay that information to the public. For the reasons stated above, we hold that the

common law privilege to report on judicial proceedings includes a complaint upon which no judicial action has been taken.

■■ Having determined that the common law privilege to report on judicial proceedings is applicable here, we must now decide whether that qualified privilege has been abused. The trial court in granting summary judgment for defendant found that the article was a fair and accurate summary of the Dini complaint and that it was not published for the sole purpose of harming plaintiff. If the newspaper article carried a "greater sting" in terms of libelous impact than did the Dini complaint, it cannot be considered a fair and accurate summary. (*Lotrich v. Life Printing & Publishing Co., Inc.* (1969), 117 Ill. App. 2d 89, 253 N.E.2d 899.) The newspaper article contained the following defamatory statements: (1) "Saved parrot, let woman die, suit says." (2) "A Glenview man has been accused in a damage suit of saving his parrot from his burning home while making no effort to rescue a young woman who was staying there." (3) "When the fire broke out, Newell rescued his parrot, but did not attempt to rescue Miss Dini from an upstairs bedroom in the home, the suit charges." The article implies that Newell made no effort to save Joan Marie Dini, and to his greater shame chose to save his parrot rather than attempt to save Joan Marie Dini. In contrast, the Dini complaint contains several allegations which depict Newell's efforts to rescue or warn the woman. The complaint alleges that Newell "attempted to put out the fire by tearing down the curtains which were in flames"; after escaping the fire, he "returned to a separate part of the home to telephone the fire department"; and he also "attempted from outside the home, to break a window in the upstairs bedroom by throwing snowballs to attract decedent's attention * * *." While these acts may not constitute bravery of the highest order, they are definite efforts to combat the fire and to aid or warn Joan Marie Dini. Moreover, the Dini complaint does not imply, as does the article, that Newell made a voluntary choice to save his parrot rather than Joan Marie Dini. The article's repeated reference to "no efforts" and its implication of a voluntary choice to save the parrot is not, as a matter of law, a fair summary of the Dini complaint. We believe a genuine issue of material fact exists as to whether the article carried a greater sting than the Dini complaint. (See *Colucci v. Chicago Crime Com.* (1975), 31 Ill. App. 3d 802, 334 N.E.2d 461.) Thus, the trial court's granting of summary judgment to defendant was improper.

■■ At oral argument, counsel for defendant maintained that the determination of whether the newspaper article was a fair and accurate summary of the Dini complaint turned on whether the reporter made a good faith effort to accurately summarize the complaint. In short, defendant advocated a subjective test of the state of mind of the reporter.

This position resembles the actual malice standard which must be met in libel actions brought by plaintiffs who are either public officials or public figures. (See *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710; *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975.) We believe that test is far too stringent here. Imposition of a state of mind standard of liability would result in defeat of virtually every action where the privilege could be invoked. We prefer the objective test of whether the libelous writing carries a greater sting than does the language found in the judicial proceeding which is being reported. Under this approach, summary judgment for defendant was improper.

This brings us to defendant's contention that the article is protected by the freedom of the press guarantee of the first amendment (U.S. Const., amend I.) Analysis of this contention draws us into an examination of recent decisions of the United States Supreme Court which limit the liability of the press in actions for libel brought under State law. Initially we note that the first amendment is applicable to the States through the fourteenth amendment. (*Stromberg v. California* (1931), 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532.) In *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, the court held that a public official, in that case a police commissioner for Montgomery, Alabama, seeking to recover damages for a defamatory falsehood relating to his official conduct, must prove with convincing clarity that the statement was made with actual malice—"that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Co.*, 376 U.S. 254, 280, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726.) In reaching this conclusion, the court first stated that the important interests protected by the free press guarantee of the first amendment necessitate tolerance of innocent falsehood so that truthful speech is not also deterred. From that premise, the court stated:

> "Whether or not a newspaper can survive a succession of such judgments, the pall of fear and timidity imposed upon those who would give voice to public criticism is an atmosphere in which the First Amendment freedom cannot survive. Plainly the Alabama law of civil libel is 'a form of regulation that creates hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law.' *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S. Ct. 631, 639, 9 L. Ed. 2d 584." (*New York Times Co.*, 376 U.S. 254, 278, 11 L. Ed. 2d 686, 705, 84 S. Ct. 710, 725.)

Thus, with this decision the Supreme Court created a constitutional standard of liability, actual malice, for libel actions brought by public officials.

Three years later in *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, the court extended the *New York Times* rule to include libel actions brought by public figures. This extension was necessitated by the court's view of the purpose of the first amendment's guarantees of free speech and free press: to protect free and robust discussion of "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." (*Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 147, 18 L. Ed. 2d 1094, 1106, 87 S. Ct. 1975, 1987.) Furthermore, these issues of public interest are not limited to government and politics. Thus, a person who has voluntarily become embroiled in the public debate of such an issue is labeled a public figure and is covered by the *New York Times* rule.

Next, in *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811, the court again extended the *New York Times* rule to include all events of public or general interest. According to this decision, by a plurality of the court, a libel action arising out of a discussion or publication of an event of public or general interest cannot succeed absent proof of actual malice. The status of the plaintiff, whether a public official, public figure or private individual, is immaterial where the matter arises out of a public event. The court reasoned:

> "If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily' choose to become involved. The public's primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant's prior anonymity or notoriety." (*Rosenbloom*, 403 U.S. 29, 43, 29 L. Ed. 2d 296, 311, 91 S. Ct. 1811, 1819.)

The *Rosenbloom* decision, however, enjoyed a short life.

A majority of the court was once again assembled in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, for the purpose of overturning *Rosenbloom*. The *Gertz* court not only rejected the *Rosenbloom* rationale, but developed new rules of liability and damages for libel actions brought by private individuals against media defendants. Initially, the *Gertz* court expressly recognized that the case involved an accommodation of competing interests: the interest of a private individual in his good name and reputation on the one side and the public interest in a free press on the other. The court also expressly affirmed the *New York Times* rule as applied to public officials or public figures, but held that the "state interest in compensating injury to the reputation of private individuals requires that a different rule should

obtain with respect to them." (*Gertz*, 418 U.S. 323, 343, 41 L. Ed. 2d 789, 807, 94 S. Ct. 2997, 3008-09.) The *Rosenbloom* analysis failed to adequately protect this State interest, and carried the additional difficulty of forcing the judiciary to decide on a case-by-case basis which publications involve issues of public or general interest. The court expressly doubted "the wisdom of committing this task to the conscience of judges." *Gertz*, 418 U.S., 323, 346, 41 L. Ed. 2d 789, 809, 94 S. Ct. 2997, 3010.

After rejecting *Rosenbloom*, the court announced its ruling:

> "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation. At least this conclusion obtains where, as here, the substance of the defamatory statement 'makes substantial damages to reputation apparent.'" (*Gertz*, 418 U.S. 323, 347-48, 41 L. Ed. 2d 789, 809-10, 94 S. Ct. 2997, 3010-11.)

Thus, with respect to private individuals, the strict rule of *New York Times* does not apply, and the States are free to define the standard of liability, provided it involves some degree of fault.

The public figure concept also drew the attention of the court in *Gertz.* The court specifically defined two classes of individuals who could be tagged public figures: (1) a person who has achieved such fame or notoriety in the community as to become a public figure for all purposes and in all contexts. (2) a person who has voluntarily injected himself or herself or is drawn into a particular public controversy. In both cases, the individual has acquired a special prominence in the resolution of public issues. (*Gertz*, 418 U.S. 323, 351, 41 L. Ed. 2d 789, 811-12, 94 S. Ct. 2997, 3012-13.) Treatment of public figures on a different basis than private individuals is justified for two reasons. First, public figures have greater access to the media to rebut any charges made against them. Second, in the usual case, the public figure has chosen to become so and therefore, has invited public attention and criticism. *Gertz*, 418 U.S. 323, 344, 41 L. Ed. 2d 789, 807-08, 94 S. Ct. 2997, 3009.

Having differentiated between public figures and private individuals and having allowed the States to establish a separate standard of liability for private individuals, the *Gertz* court also imposed limitations on the type of injuries for which a private individual could recover damages. The *Gertz* court prohibited States from allowing recovery of "presumed

or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth." (*Gertz*, 418 U.S. 323, 349, 41 L. Ed. 2d 789, 810, 94 S. Ct. 2997, 3011.) In addition, a private individual was limited to recovery for actual injury. Although the *Gertz* court did not define the exact boundaries of actual injury, it did state that actual injury is not limited to out-of-pocket loss, and went on to explain that this concept included "impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." (*Gertz*, 418 U.S. 323, 350, 41 L. Ed. 2d 789, 811, 94 S. Ct. 2997, 3012.) Juries hearing such cases must be appropriately instructed, and all awards must be supported by competent evidence. The *Gertz* decision stands today as the court's most complete treatment of libel actions brought by private individuals against media defendants. Its significance cannot be overstated.

■■ In *Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292, for the first time since the *Gertz* decision, our supreme court was faced with a libel action brought by a private individual against a media defendant. Following the directive of the *Gertz* court, our supreme court adopted a negligence standard for libel action under these circumstances. In support of its conclusion, the court relied on article I, section 4, of the Illinois Constitution of 1970. Section 4 states in pertinent part: "All persons may speak, write and publish freely, being responsible for the abuse of that liberty." The *Troman* court believed that a negligence standard adequately protected the interests of a free press and at the same time allowed the individual to vindicate his good name. Under a standard of ordinary negligence, the question is whether the defendant had reasonable grounds to believe his statement to be true. A relevant factor in this determination is whether defendant made a reasonable investigation into the truth of the statements. (*Troman*, 62 Ill. 2d 184, 197, 340 N.E.2d 292, 298.) The *Troman* court provided the following summary:

"We hold, therefore, that in a suit brought by a private individual to recover actual damages for a defamatory publication whose substantial danger to reputation is apparent, recovery may be had upon proof that the publication was false, and that the defendant either knew it to be false, or, believing it to be true, lacked reasonable grounds for that belief. We hold further that negligence may form the basis of liability regardless of whether or not the publication in question related to a matter of public or general interest. Our holding in the present case is, of course, not intended to remove any of the absolute or qualified privileges which have heretofore been recognized in this State to the extent that the facts may warrant their application." (*Troman*, 62 Ill. 2d 184, 198, 340 N.E.2d 292, 299.)

We must now apply the principles of law discussed above to the present case.

As we have discussed above, the article impeaches plaintiff's respect for the sanctity of human life and therefore libels plaintiff. The nature of this libel makes the substantial danger to plaintiff's reputation apparent from the face of the article. Every reader of this article will be immediately aware of its damaging and libelous meaning. Thus, a newspaper editor was put on notice of the danger in publishing such an article.

Plaintiff George Newell is not, as conceded by both sides, a public official. Nor is he a public figure. Newell has not acquired the general fame or notoriety to be a public figure for all purposes. (*Gertz.*) Also, Newell did not voluntarily inject himself and was not drawn into a particular public controversy and thereby became a public figure for that limited issue. (*Gertz.*) Plaintiff, of course, did not initiate the wrongful death action brought against him. He was made a defendant to that action. Moreover, at the time the article was published, Newell had neither received summons nor had he filed an answer to the complaint. Given this factual posture, plaintiff can hardly be said to have voluntarily injected himself into a public controversy.

■■ In argument before this court, defendant's counsel stated that this article was a matter of public interest because it involved the death of a human being in a fire, a fate which allegedly was caused by the negligence of plaintiff. From this starting point, it could be argued that the resulting wrongful death action constituted a public controversy, and plaintiff, Geroge Newell, having been drawn into the suit as a defendant, was a public figure for that limited issue. A similar argument was soundly rejected by the United States Supreme Court in *Time, Inc. v. Firestone* (1976), 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958. In that case, plaintiff filed an action for separate maintenance in a Florida State court. Her husband filed a countersuit for divorce. Defendant, publisher of a weekly news magazine, inaccurately reported that plaintiff's husband was granted a divorce on grounds of extreme cruelty and adultery. The magazine account was clearly libelous. The court first stated that a divorce proceeding is not the type of public controversy referred to in *Gertz*. (*Firestone.*) The court there addressed the argument that the divorce proceeding, as a judicial proceeding, elevated all parties to the action to the status of public figures. The court's treatment of this question merits repetition here:

> "Imposing upon the law of private defamation the rather drastic limitations worked by *New York Times* cannot be justified by generalized references to the public interest in reports of judicial proceedings. The details of many, if not most, courtroom battles

would add almost nothing toward advancing the uninhibited debate on public issue thought to provide principal support for the decision in *New York Times*. See 376 U.S., at 270; c.f. *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). And while participants in some litigation may be legitimate 'public figures,' either generally or for the limited purpose of that litigation, the majority will more likely resemble respondent, drawn into a public forum largely against their will in order to attempt to obtain the only redress available to them or to defend themselves against actions brought by the State or by others. There appears little reason why these individuals should substantially forfeit that degree of protection which the law of defamation would otherwise afford them simply by virtue of their being drawn into a courtroom. The public interest in accurate reports of judicial proceedings is substantially protected by *Cox Broadcasting Corp.*, supra. [*Cox Broadcasting Corp. v. Cohn* (1975), 420 U.S. 469.] As to inaccurate and defamatory reports of facts matters deserving no First Amendment protection, see 418 U.S., at 340, we think *Gertz* provides an adequate safeguard for the constitutionally protected interests of the press and affords it a tolerable margin for error by requiring some type of fault." (*Firestone*, 424 U.S. 448, 457, 47 L. Ed. 2d 154, 164-65, 96 S. Ct. 958, 966-67; see also *Wolston v. Reader's Digest Association, Inc.* (1979), 443 U.S. 157, 61 L. Ed. 2d 450, 99 S. Ct. 2701.)

In the instant case, plaintiff is not a public figure and to recover damages need only prove negligence (see *Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292) on the part of defendant.

■■ In count II of plaintiff's amended complaint, plaintiff alleged that defendant negligently published the newspaper article summarizing the Dini complaint. More specifically, plaintiff alleged that defendant knew or should have known the article was false, did not believe the truth of the article, had no reasonable grounds to believe the truth of the article, and failed to make a reasonable investigation into the truth of the article. The affidavit of the reporter, Saundra Saperstein, states that her article is based solely on the Dini complaint and that she had no independent knowledge of the underlying facts. From the foregoing, we believe that a genuine issue of fact exists as to whether defendant published the article with a reasonable belief in its accuracy. Two facts support our decision. First, the discrepancies between the Dini complaint and the article permit an inference of negligent reporting. Second, plaintiff has alleged a failure to make a reasonable investigation, and the reporter's affidavit failed to rebut this contention. Failure to make a reasonable investigation is a relevant factor in determining whether defendant published this article without a reasonable belief in its accuracy. (*Troman v. Wood* (1975), 62

Ill. 2d 184, 340 N.E.2d 292.) Count II of plaintiff's amended complaint should have survived defendant's motion for summary judgment. We must note that under *Gertz* and *Troman* plaintiff may only recover for "actual injuries" as defined in those cases unless he is capable of proving actual malice.

██ A communication is published with actual malice when it is made with knowledge of its falsity or with reckless disregard of the truth. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710.) Reckless disregard for the truth has been equated with proof that defendant "in fact entertained serious doubts as to the truth" of the publication. (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325.) Furthermore, in *Garrison v. Louisiana* (1964), 379 U.S. 64, 74, 85 S. Ct. 209, 216, 13 L. Ed. 2d 125, 133, the court stressed the necessity for a showing that a false publication was made with a "high degree of awareness of * * * probable falsity." It should also be pointed out that actual malice under *New York Times* is separate from common law malice or ill will, hatred or wanton desire to injure the person defamed. (*Rosenblatt v. Baer* (1966), 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669; *Garrison.*) Plaintiff has alleged in count I of his amended complaint that defendant published this article with knowledge of its falsity or with reckless disregard for the truth. The affidavit of the reporter, Saundra Saperstein, states that the source of the article was the Dini complaint and that she did not have an independent knowledge of the truth or falsity of the allegations in the Dini complaint. Nor did the reporter know George Newell. On this basis, defendant argued below that no genuine issue of fact exists as to whether the article was published with actual malice. To accept defendant's contention we would have to hold, as a matter of law, that all communications made by the media, which are based entirely on the contents of a civil complaint, are published without actual malice. We do not believe this is true. Merely because a publication is a report of a civil complaint does not exclude the possibility that the article was published with actual malice. And serious inaccuracies in the reporting of a civil complaint may be a signal of underlying actual malice. The affidavit offered by defendant has not eliminated the factual issue of actual malice, and therefore, plaintiff may upon proof of actual malice recover punitive or presumed damages. See *Gertz* and *Troman.*

We now reach defendant's final contention that a constitutional privilege of neutral reporting envelops the publication in this case. This privilege was first announced in *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F. 2d 113, *cert. denied* (1977), 434 U.S. 1002, 54 L. Ed. 2d 498, 98 S. Ct. 647, and has been adopted only in one appellate decision in Illinois. In *Krauss v. Champaign News Gazette, Inc.* (1978), 59

Ill. App. 3d 745, 375 N.E.2d 1362, the court described this privilege as follows:

"Thus, the doctrine of neutral reportage gives bent to a privilege by the terms of which the press can publish items of information relating to public issues, personalities, or programs which need not be literally accurate. If the journalist believes, reasonably and in good faith, that his story accurately conveys information asserted about a personality or a program, and such assertion is made under circumstances wherein the mere assertion is, in fact, newsworthy, then he need inquire no further. Unless it is shown that the journalist deliberately distorts these statements to launch a personal attack of his own upon the public figure or the program, that which he reports under such circumstances is privileged." (*Krauss*, 59 Ill. App. 3d 745, 747, 375 N.E.2d 1362, 1363.)

This reasoning can be summarized as applying a constitutional privilege to all publications which are either "newsworthy" or concern "public issues, personalities, or programs." An analysis almost identical to *Krauss* was employed by a plurality of the Supreme Court in *Rosenbloom v. Metromedia, Inc.* (1971), 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811. In that case, the plurality ruled that publications by the media of events of "public or general interest" were covered by the *New York Times* rule. (*Rosenbloom*, 403 U.S. 29, 43, 29 L. Ed. 2d 296, 311, 91 S. Ct. 1811, 1819.) This analysis, as noted above, was expressly rejected by a majority of the court in *Gertz*. Constitutional protection of the press from libel actions turns on the status of the plaintiff, regardless of the subject matter of the publication. The analysis developed by the *Edwards* and the *Krauss* courts has been expressly rejected by both the United States Supreme Court in *Gertz* and the Illinois Supreme Court in *Troman v. Wood* (1975), 62 Ill. 2d 184, 340 N.E.2d 292. We therefore decline defendant's invitation to adopt the constitutional privilege recognized in *Krauss*.

■■ Our criticism of the *Krauss* and *Edwards* analysis does not stand alone. In *Dickey v. CBS Inc.* (3d Cir. 1978), 583 F.2d 1221, the Court of Appeals for the Third Circuit expressly refused to follow the *Edwards* analysis. The court in *Dickey* stated that the *Edwards* analysis was the result of a faulty interpretation of *Time, Inc. v. Pape* (1971), 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633, and was erroneous in light of the *Gertz* decision. In our own State, in *Makis v. Area Publications Corp.* (1979), 77 Ill. App. 3d 452, 462-63, 395 N.E.2d 1185, 1192-93, Judge Romiti in a dissenting opinion directly criticized the analysis employed in *Edwards* and *Krauss*. We believe that the constitutional limitations on the liability of the press for libel have been fully and exclusively expressed by the Supreme Court in *Time, Inc. v. Firestone* (1976), 424 U.S. 448, 47 L. Ed.

2d 154, 96 S. Ct. 958; *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997; *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975; and *New York Times v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710. Thus, no constitutional privilege exists for neutral reporting of newsworthy matters or matters involving public issues, personalities, or public programs.

To summarize, the article published by defendant was libelous per quod, and the innocent construction rule does not apply. The common law privilege to report on judicial proceedings includes complaints upon which no judicial action has been taken. An issue of material fact exists as to whether the article is a fair and accurate summary of the Dini complaint. Consistent with *Gertz* and *Troman*, plaintiff, as a private person, must prove that publication of this article was negligent. If plaintiff is able to prove negligence he may recover damages for "actual injuries," and only upon proof of "actual malice" may punitive damages be awarded or actual damages be presumed. (See *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 346-51, 41 L. Ed. 2d 789, 809-11, 94 S. Ct. 2997, 3010-12; *Troman v. Wood* (1975), 62 Ill. 2d 184, 192, 340 N.E.2d 292, 296.) Accordingly, the order of the circuit court of Cook County granting summary judgment to defendant is reversed and the cause remanded for further proceedings consistent with the content of this opinion.

Reversed and remanded.

MEJDA and WILSON, JJ., concur.