ROBERT A. CHAPSKI, Plaintiff-Appellant, *v.* THE COPLEY PRESS *et al.*, Defendants-Appellees.

Second District    No. 80-505

Opinion filed October 16, 1981.

Van R. Richards, Jr., of Geister, Schnell, Richards and Brown, Chartered, and Robert A. Chapski, Ltd., both of Elgin, for appellant.

Lambert M. Ochsenschlager and Wayne F. Wiler, both of Reid, Ochsenschlager, Murphy & Hupp, of Aurora, for appellees.

Mr. JUSTICE NASH delivered the opinion of the court:

Plaintiff, Robert A. Chapski, an attorney, brought this action to recover damages for alleged libel published by defendants, Copley Press, Inc.; The Daily Courier News; its editor and publisher, D. Ray Wilson; its executive editor, LeRoy Clemens; and a reporter, Michael Bailey.

The trial court dismissed the complaint finding that the innocent-construction rule applied to the newspaper articles in question and plaintiff appeals.

The series of newspaper articles upon which this action is based were published in the Daily Courier News from February 8, 1979, through January 25, 1980, and related to the death of two-year-old Kristie Hubbard as a result of child abuse. Plaintiff had represented the child's mother, Kathleen Hubbard, in both juvenile and divorce proceedings in Kane County in which Mrs. Hubbard had been granted custody of the child. The newspaper articles described the court procedures prior to the death of the child and plaintiff's role as an attorney in the case.

Plaintiff alleged in count I of his complaint that on September 14, 1978, while all of the interested parties were before the juvenile division of the circuit court, Judge Neil Mahoney entered an order returning custody of the child to Kathleen Hubbard. Subsequently, on September 21, plaintiff again appeared before Judge Mahoney, who then entered a written order confirming the order of September 14. Kathleen Hubbard had filed a petition for dissolution of marriage in Kane County on September 6, and plaintiff alleged that he was informed that her husband had filed a similar petition in the circuit of Cook County on September 12 in which he intended to seek custody of the minor child. On September 26, plaintiff obtained a "status quo order" of custody in the divorce action and on October 13, the parties, their attorneys and the minor child appeared in court and the child was examined for any marks or bruises; none were found and the orders granting custody to Kathleen Hubbard remained in effect from that date until February 2, 1979, when Kristie Hubbard died. Plaintiff further alleged that from October 13, 1978, until February 2, 1979, no further court proceedings were held concerning the custody of the child.

Plaintiff alleged that from February 8, 1979, through January 25, 1980, the defendants "seized upon this unfortunate set of circumstances to wrongfully and maliciously and with intent to defame and injure the

plaintiff in his reputation, caused to be published in the aforementioned newspaper, false, defamatory, libelous articles and editorials * * *." The allegedly libelous portions of 10 newspaper articles were set forth in each of the first 10 counts of the complaint, and full texts of the articles were appended to it as exhibits.

Count I of the complaint was directed to an article published on February 8, 1979, with the headline "Child custody battle sad as child's death itself." It characterized the September 21 hearing as "impromptu" and quoted an assistant public defender that "it's my feeling that when an attorney comes in with a motion that will effect the status of the case, court procedures require proper notice to other parties."

The article which formed the basis for count II was published February 9 and concerned plaintiff's representation of Norman Platter, Kathleen Hubbard's boyfriend, who was accused in the beating death of the child. The article noted that custody of Kristie Hubbard had previously been taken from her mother in August, reportedly because of abuse of the child by Platter, and that custody was returned to Kathleen Hubbard in "an unscheduled hearing in September."

Count III was based on an article published February 11, 1979. It stated that based upon information supplied by plaintiff at "an unscheduled hearing" that the mother no longer lived with Platter, Judge Mahoney agreed to return the child to her without consulting the Department of Children and Family Services. The article also queried whether plaintiff knew of abuse of the child from the juvenile proceedings when he later appeared before Judge McCarthy, who in the mother's divorce proceeding was deciding on the custody of the child, and whether plaintiff had a legal or moral responsibility to inform Judge McCarthy of the alleged abuse.

Count IV of the complaint was based on an article published February 16, 1979, and bore the headline, "Who's to blame? Many questions in baby's death." It again referred to plaintiff's appearance at "an unscheduled hearing" during which he informed the court that Mrs. Hubbard had moved out of the Platter residence. The article also referred to a custody hearing held in the divorce proceedings and noted that although local rules required four days notice before a hearing, plaintiff did not mail notice of the proceeding until three days prior to it. The article also contained a statement attributed to the husband's attorney that he advised his client to seek local counsel because he felt someone was "going in the back door in Kane County." Although the article stated that the husband's attorney would not make any direct comment in reference to plaintiff, it quoted him as saying that in his opinion in custody cases a lawyer "has a responsibility to human life above that to his client".

Count V of the complaint was based upon an article published

February 18, 1979, which bore the headline "To clear the record * * *."
It purported to summarize the events reported in the previously published articles and noted that "Chapski did not mention to McCarthy the incident of physical abuse, the fact that DCFS was involved in the case, the fact that there were other court proceedings before Judge Mahoney, or the fact that there were criminal charges pending at that time against the mother and Platter. It is agree [sic] he had no legal requirement to do any of these things. Every lawyer contacted by me, though, said they would assume a moral obligation to do so."

Count VI of the complaint was founded upon an article published February 25, 1979, which bore the headline, "Legal report card: F." The excerpt reproduced in the complaint reads in its entirety:

"While no lawyer will publicly criticize anyone concerned with the case, five different lawyers have spoken to me privately, outlining their experiences with a shaky legal system that condones any lawyer who skirts the ethics of their profession.

'This is the culmination of several years of these shenanigans,' one lawyer told me.

'This has been going on continually. Now, it's gone too far, somebody's dead,' he said."

Count VII of the complaint reproduced a portion of an article which appeared on February 28, 1979, wherein it was stated that "the child was returned in an unscheduled hearing before another judge a short time later. Several lawyers have questioned the propriety of that unscheduled hearing * * *."

Counts VIII, IX and X of the complaint were based upon articles published March 9, 1979, June 27, 1979, and September 30, 1979. The March 9 article noted that the Attorney Registration and Disciplinary Commission had acknowledged they were investigating a complaint about plaintiff's conduct in the case and summarized the events which had been reported in the earlier articles. The June 27 and September 30 articles again referred to an *ex parte* hearing in September in which custody of the child had been returned to the mother based largely upon representations made by plaintiff as her attorney.

Plaintiff's complaint further alleged that all of the aforementioned statements were false since the court had actually granted custody to his client on September 14, 1978, when all parties and their attorneys were present before the court. Plaintiff also alleged that as a result of the publication of these articles, a certain segment of the population formed "The concerned citizens for Kristies" and that this group "aided and abetted the defendants' cause to defame [his] character and reputation * * * by contacting various state authorities." Plaintiff further alleged that the Attorney Registration and Disciplinary Commission concluded that Judge

Mahoney's order of September 21, 1978, was merely a written confirmation of his earlier order and that plaintiff's conduct had absolutely nothing to do with the child's death. Plaintiff charged that instead of retracting their allegedly libelous statements after the Commission released its findings, they further libeled him by publishing false statements such as "the bar association asked for the investigation after several area attorneys questioned the propriety of the legal proceedings * * *." Finally, plaintiff charged that the foregoing articles damaged his reputation, and he sought general and punitive damages of $3,500,000 in each count of the complaint.

Count XI of the complaint repeated the allegations of the other counts and charged defendants were guilty of a conspiracy to injure his good reputation by publishing the foregoing articles.

Defendants moved under sections 45 and 48 of the Civil Practice Act to strike and dismiss the complaint on the grounds, *inter alia*, the alleged defamatory publications were subject to an innocent construction and thus not actionable. The trial court agreed and noted that although the articles were highly critical of the court system and plaintiff's conduct within that system, they did not charge plaintiff with any illegal act nor did they suggest he was incompetent. The court concluded that the articles were susceptible to an innocent construction since their main thrust was "directed to and critical of the court system as it relates to the proceedings involving the custody of the named child. References to plaintiff are in regard to alleged actions taken by plaintiff on behalf of his client within that court system * * * and of the manner in which plaintiff was permitted to represent the interests of his client because of the failing of the court system."

■■ A publication which prejudices a party in his profession is actionable *per se*. (*Cooper v. Rockford Newspapers, Inc.* (1977), 50 Ill. App. 3d 247, 248; *McGuire v. Jankiewicz* (1972), 8 Ill. App. 3d 319.) However, since 1962, Illinois courts have applied the innocent-construction rule to publications to determine first whether they must be given an injurious meaning or whether they may be harmlessly construed. As set forth by our supreme court in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, *cert. denied* (1962), 371 U.S. 877, 9 L. Ed. 2d 114, 83 S. Ct. 148, the rule requires that a writing "is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." (24 Ill. 2d 437, 442.)[1] In addition to ascertaining whether a statement is defamatory, the rule is also to be applied in

---

[1] See Polelle, *The Guilt of the "Innocent Construction Rule" in Illinois Defamation Law*, 1 N. Ill. U. L. Rev. 181 (1981).

determining whether it refers to the plaintiff. (*Levinson v. Time, Inc.* (1980), 89 Ill. App. 3d 338; *Vee See Construction Co. v. Jensen & Halstead, Ltd.* (1979), 79 Ill. App. 3d 1084.) No general test has been devised for determining whether a statement is defamatory and each case must be decided according to its own facts. (*Vee See Construction Co.*; *Galvin v. Gallagher* (1980), 81 Ill. App. 3d 927.) The meaning of a statement is not to be determined by examining isolated phrases, but must be gathered from the context of the language of the publication as a whole, stripped of all innuendo. (*Levinson v. Time, Inc.*; *Galvin v. Gallagher*; *Vee See Construction Co. v. Jensen & Halstead, Ltd.*) The words are to be accorded their natural and obvious meaning (*Levinson v. Time, Inc.*), and must be read in their best possible sense. (*Vee See Construction Co. v. Jensen & Halstead, Ltd.*; *Wexler v. Chicago Tribune Co.* (1979), 69 Ill. App. 3d 610.) Whether language is susceptible to an innocent construction is a question of law to be decided by the court. If reached, it is a question of fact for the jury whether the statement was understood by its readers as defamatory. *Troman v. Wood* (1975), 62 Ill. 2d 184; *Valentine v. North American Co. for Life & Health Insurance* (1974), 60 Ill. 2d 168; *Levinson v. Time, Inc.*; *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345.

Plaintiff contends that the articles published by defendants charge him with a lack of moral or legal responsibility and integrity in the performance of his professional duties. When read as a whole, however, stripped of all innuendo, we must conclude each of the articles is susceptible to an innocent construction and therefore not actionable as a matter of law.

In applying the rule to the article upon which count I is based it is apparent that the characterization of the hearing as "impromptu" need not be understood as an accusation that plaintiff had acted improperly or was otherwise guilty of criminal activity. Taking the article as a whole and without innuendo, it can be considered as a criticism of the court system rather than plaintiff. With respect to the quote from an assistant public defender concerning notice, taken in context, it is critical of Judge Mahoney and not plaintiff. See *Galvin v. Gallagher* (1980), 81 Ill. App. 3d 927.

The article upon which count II is based merely notes that plaintiff represented the person accused of abusing the child and that custody of the child had been returned to the mother in an "unscheduled hearing." Not only is the characterization of the hearing as unscheduled susceptible to an innocent construction, the article does not refer to plaintiff in stating that the hearing was unscheduled.

When read in context, the article which forms the basis for count III is a criticism of the court system in general and not plaintiff. Although it states that the "two courts were played off against each other" and in-

quires whether plaintiff had a legal or moral responsibility to do certain things, it does not accuse him of any impropriety. Rather, the words are used in a figurative sense to demonstrate the writer's personal disagreement with what occurred. (See *Catalano v. Pechous* (1980), 83 Ill. 2d 146; *Belmonte v. Rubin* (1979), 68 Ill. App. 3d 700.) While accusations of impropriety or criminal activity cast in terms of an opinion are not protected (*Catalano v. Pechous*), the language in question is not susceptible to such a construction.

In the article upon which count IV is founded, plaintiff is accused of giving improper notice to the husband in the divorce proceedings. This statement is susceptible to an innocent construction as it does not accuse plaintiff of deliberately failing to give proper notice so as to gain an unfair advantage. Moreover, in another part of the same article it is stated that plaintiff may not have known there was not proper notice. The reference in the article to the opinion of the husband's attorney that he "felt someone was going in the back door in Kane County" does not require that it be applied to plaintiff; it is ambiguous and can be read to refer to persons other than him. (See *Belmonte v. Rubin* (1979), 68 Ill. App. 3d 700, 701 ("[m]y personal opinion is that *they're* trying to steal the girls' home") (emphasis added); see also *Galvin v. Gallagher* (1980), 81 Ill. App. 3d 927.) In addition, the language can be considered as rhetorical hyperbole used not to accuse anyone of impropriety, but to convey the speaker's opinion. See *Greenbelt Cooperative Publishing Association v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537 (reference to plaintiff's negotiating position as "blackmail").

The article upon which count V is based is entitled, "To clear the record * * *" and when read in context also notes the plaintiff had no legal duty to inform the divorce court of the juvenile proceedings. The statement that plaintiff did not do so is not, therefore, actionable since plaintiff is not being accused of any illegality. While the article states that some lawyers would assume a moral obligation to so inform the court, it need not necessarily be interpreted to imply that plaintiff was wanting in integrity for failing to do so. See *Galvin v. Gallagher* (1980), 81 Ill. App. 3d 927; *Belmonte v. Rubin* (1979), 68 Ill. App. 3d 700.

The article upon which Count VI is based was entitled "Legal report card: F." When read in context it is again a criticism of the legal system and not of plaintiff. The article notes that "[n]o matter how you cut it, the system failed in this case." This and other statements in the article can be read as referring to persons other than plaintiff. While the article contains statements attributed to other attorneys critical of the events therein reported, it also states that those lawyers were not criticizing "anyone concerned with the case." The headline "Legal report card: F," although not particularly flattering, is clearly an opinion and is not therefore

actionable in context. "Opinions and judgments of a party may be critical or harsh, or even abusive, but still not subject the author to liability." (*Galvin v. Gallagher* (1980), 81 Ill. App. 3d 927, 930.) The law does not provide a remedy for "every expression of opinion touching on a person's capabilities or qualifications * * * no matter how much the complained of statement may injure the subject person in his own conception * * *." (*Dauw v. Field Enterprises, Inc.* (1979), 78 Ill. App. 3d 67, 71.) The reference in the article to "any lawyer who skirts the ethics of their profession" is susceptible to an innocent construction since the word "any" does not require an interpretation that it refers to plaintiff. (See *Belmonte v. Rubin* (1979), 68 Ill. App. 3d 700.) The phrases "skirts the ethics" and "shenanigans" need not be read as an accusation of impropriety. See *Valentine v. North American Co. for Life & Health Insurance* (1974), 60 Ill. 2d 168, 170 ("[h]e was a lousy agent" held not defamatory); compare *McGuire v. Jankiewicz* (1972), 8 Ill. App. 3d 319 ("you couldn't have chosen a worse lawyer" held actionable).

The article upon which count VII is based refers to an "unscheduled hearing," but as noted earlier this statement may be innocently construed. The article also notes that "several lawyers have questioned the propriety of that unscheduled hearing." This statement can also be given a nondefamatory meaning since the reader would not need to take it as an accusation that anyone had done anything improper as the propriety of the hearing was merely questioned.

■■ Plaintiff contends that the statement in the article which forms the basis for count VIII, *i.e.*, that the Attorney Registration and Disciplinary Commission "acknowledged that they are investigating a complaint about [him]," is actionable because no complaint was ever filed and the statement was false. It is apparent, however, that plaintiff sees the word "complaint" in the strict legal sense; when so read the statement could be actionable since no formal charge was filed. Such an interpretation does not necessarily follow, however, since the term "complaint" need not always be given its technical, legal meaning. In fact, plaintiff acknowledges elsewhere in his complaint that the Attorney Registration and Disciplinary Commission was investigating his role in the case and, when read as a whole, the article can be construed to mean no more than this. See *Springer v. Harwig* (1981), 94 Ill. App. 3d 281.

In count IX plaintiff singled out a portion of an article which noted that the custody of the child was returned "at a hearing attended only by a judge and Kathy Hubbard's lawyer, Robert Chapski * * *." As noted earlier, this statement is plainly susceptible to an innocent construction if innuendo is not applied.

A similar analysis applies to the article upon which count X is founded. There, the hearing was again referred to as "unscheduled." The

article also stated that the judge's decision to return custody of the child to her mother was based "largely on representations made by Robert Chapski * * *," but it does not state that the representations were false or otherwise imply that anything improper occurred. Moreover, the first article published in the series on February 8, 1979, upon which count I was based, also refers to these representations and notes that they were true.

Count XI of the complaint alleged a conspiracy among defendants to injure plaintiff's good name and reputation and cause him to be suspended or disbarred by publishing the series of allegedly libelous articles. Since the articles are susceptible to an innocent construction and are not actionable, a cause of action based upon a conspiracy to injure plaintiff's reputation by publishing them must fail.

■■ For these reasons, we find that the trial court correctly applied the innocent-construction rule in dismissing plaintiff's complaint. Although plaintiff asserts that under *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, the trial court could not "sweep the defendant-appellee's libel under the legal rug of "innocent construction * * *," *Newell* is clearly distinguishable from the present case. There, a newspaper inaccurately reported a civil suit in charging the plaintiff with making a conscious decision to save his pet parrot from a fire in his home, rather than alerting a guest who was asleep upstairs who subsequently died. The complaint at issue in *Newell* was held to state a cause of action since the language was not susceptible to an innocent construction and the defendant abused the qualified privilege to report on judicial proceedings.

In view of the foregoing we conclude that the articles can be innocently construed and are therefore nonactionable as a matter of law. We do not reach and it is unnecessary for us to consider the other issues raised by the parties.

Accordingly, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

REINHARD and VAN DEUSEN, JJ., concur.