Docket No. 101054.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

PATRICK A. TUITE, Appellant, v. MICHAEL CORBITT *et al.*, Appellees.

*Opinion filed December 21, 2006.*

JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Justices Fitzgerald, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman concurred in part and dissented in part, with opinion.

Chief Justice Thomas and Justice Burke took no part in the decision.

## OPINION

Plaintiff, Patrick A. Tuite, filed a complaint in the circuit court of Cook County against defendants, Michael Corbitt, Sam Giancana, and HarperCollins Publishers, alleging claims of defamation *per se*, false light invasion of privacy, and intentional infliction of emotional distress as a result of certain statements contained in defendants' book, Double Deal. Defendants filed a motion to dismiss the complaint under section 2–615 of the Code of Civil Procedure (Code) (735 ILCS 5/2–615 (West 2002)). The trial court granted defendants'

motion to dismiss, finding that the disputed statements were capable of a reasonable innocent construction. The appellate court affirmed the trial court's judgment. 358 Ill. App. 3d 889.

We allowed Tuite's petition for leave to appeal. 177 Ill. 2d R. 315(a). Tuite contends that this court should abandon the innocent construction rule. In the alternative, Tuite contends that the dismissal of his complaint should be reversed because there is no reasonable innocent construction for the statements. We decline to abandon the innocent construction rule, but find that the appellate court erred in affirming the dismissal of plaintiff's claims of defamation *per se* and false light invasion of privacy based on the application of the rule. We therefore reverse the judgments of the appellate and circuit courts and remand this matter to the circuit court for further proceedings.

## I. BACKGROUND

Corbitt and Giancana coauthored Double Deal, a book that recounts Corbitt's experiences in organized crime in the Chicago area. HarperCollins published Double Deal. In Double Deal, Corbitt and Giancana included a discussion of Tuite's involvement in defending alleged Chicago mafia boss Joey Aiuppa against criminal charges in 1985. Based on the description of his involvement in Aiuppa's defense, Tuite filed a complaint alleging defamation *per se*, false light invasion of privacy, and intentional infliction of emotional distress.

In his complaint, Tuite alleged that Corbitt is a "self-admitted professional criminal, whose life in crime was in the service of the Chicago mafia." Double Deal purports to be a nonfiction account of organized crime activities in the Chicago area. The cover of the book states it is "The Inside Story of Murder, Unbridled Corruption, and the Cop Who Was a Mobster." Tuite identified the following excerpt from Double Deal as the basis of his claims:

> "Unfortunately for the Outfit, during [Operation] Strawman, the FBI had uncovered tons of evidence connecting the Chicago bosses to the guys in Kansas City. When the FBI started calling this new case against Chicago's top bosses Strawman II, it was pretty clear they were on a roll.

Although Strawman II put a crimp in Chicago's top guys, particularly Joey Aiuppa, at first they figured they could beat the charges. But then when witnesses starting [*sic*] lining up against them, they began to get worried. Three of the FBI's key witnesses–Allen Glick, the guy who fronted four Vegas casinos for Chicago; Aladena 'Jimmy the Weasel' Fratianno; and the former Teamsters president Roy Williams–had everyone seriously concerned. From what I understand, they knew enough to bury just about everybody who was anybody in the Outfit.

And it was no use trying to take them out, either. Even if Lombardo (who was serving time on [Operation] Pendorf in Leavenworth) or Spilotro (who was in a Chicago jail awaiting trial for murder) had been available to do the job, it would have been an impossible task. The more critical witnesses, like Roy Williams, had been under heavy security for months, ever since the convictions had come down in Operation Pendorf. So they were virtually untouchable.

Ultimately it wouldn't be just Williams, Glick, and the Weasel the Outfit would have to worry about; by the time the trial got under way in 1985, there were guys flipping left and right. It was pretty clear that the Chicago Outfit was going to take a major hit. Sal told me Joey Aiuppa figured he was going away for sure if he didn't get some better representation. At seventy-seven, Joey Aiuppa was an old man, and he didn't want to die in prison. He was desperate to walk away from those charges and wanted to bring in Pat Tuite, an attorney who'd represented mob cases in the past. But Sal said that Aiuppa had run into a wall with Tuite. Supposedly, the big-shot lawyer told Aiuppa that he'd need a million-dollar retainer before he'd even walk in the door.

It might seem crazy, playing hardball with an Outfit boss like that, but Tuite had his reasons; he was far from stupid. He knew that Outfit guys had a reputation for not paying their attorneys. They'd get off and then leave the lawyer holding the bag. If the guy made any noise about his bill, it was 'take me to court,' which, of course, no one ever had the balls to do.

So now Aiuppa and his pals had a dilemma. They didn't want to go on their kick, take their defense money out of their own pockets. So what did they do? They decided to go to Las Vegas–the now crime-free town–and let their skim pay Tuite.

[The book then describes how Corbitt and others traveled to Utah, picked up duffel bags containing $1 million in $100 bills, and delivered the bags to an individual in Chicago. The book states, 'I understand Tuite got his retainer later that night.']

After Tuite was on the case, all the guys were sort of semijubilant. Everybody figured Tuite had it all handled. To Aiuppa and his codefendants, it was like it was a done deal, like they were all going to be acquitted. So you can imagine their reaction when they were all found guilty the following January–1986. I understand they were all sitting around their hotel room in Kansas City, ready to open a bottle of champagne, when the feds showed up to arrest them. And what about Tuite? What kind of explanation could he possibly have given for this result? I can't think of one that would've satisfied me–not after advancing him a million bucks for his legal fees. And I guess that's why, for the life of me, I've never understood why Pat Tuite didn't get whacked. Go figure."

Tuite alleged that these statements are false. He was not retained by Aiuppa, he was not the attorney of record, and he did not file an appearance or participate in the trial. Rather, he served only as a consultant to Aiuppa's attorneys. Additionally, he did not demand or receive a retainer of $1 million cash and did not knowingly receive illegally obtained funds as payment for his consulting services. Further, Tuite alleged the statements falsely imply that he would use all or a portion of the cash retainer to commit bribery or other criminal conduct to ensure that he "had it all handled" and that acquittal was "a done deal."

Tuite alleged that the statements are defamatory *per se* because they impute to him criminal wrongdoing, a want of integrity as an officer of the court, a want of integrity in the performance of his ethical duties as an attorney, and an inability to perform his professional duties as a criminal defense attorney. Tuite further alleged

that the defendants were negligent in publishing the false statements or, in the alternative, that the defendants published the statements with knowledge that they were false or with reckless disregard as to their truth or falsity. Tuite alleged that publication of the statements was wilful and wanton and damaged his reputation as an attorney and as an officer of the court.

In support of his claim of intentional infliction of emotional distress, Tuite alleged that statements in the book, as well as statements made by defendants in marketing the book, caused him to fear for his safety and the safety of those around him. Tuite alleged that the statements were extreme and outrageous and caused him severe emotional distress.

Defendants filed a motion to dismiss the complaint under section 2–615 of the Code, asserting that the complaint failed to state a claim of defamation *per se* because the disputed statements are capable of an innocent construction. Additionally, defendants asserted that the complaint failed to state a claim of false light invasion of privacy because Tuite failed to allege special damages as required to support such a claim when the statements are not defamatory *per se*. Defendants further asserted that the conduct alleged in the complaint was not sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress.

Tuite filed an amended complaint, restating the allegations of his original complaint and attaching a copy of Double Deal as an exhibit. The trial court subsequently granted defendants' motion to dismiss the amended complaint. The trial court found that the disputed statements were not defamatory *per se* because they were capable of a reasonable innocent construction. The court also held that Tuite failed to state a claim of false light invasion of privacy because he did not allege special damages. Further, the statements were not sufficiently extreme and outrageous to support a claim of intentional infliction of emotional distress. The trial court, therefore, dismissed the amended complaint in its entirety.

On appeal, Tuite argued that the trial court erred in dismissing his claims of defamation *per se* and false light invasion of privacy because, when read in context, the statements do not permit a reasonable innocent construction. Tuite also argued that his complaint adequately alleged a claim of intentional infliction of emotional distress.

The appellate court, with one justice dissenting in part, affirmed the trial court's judgment. 358 Ill. App. 3d at 891. The appellate court found that the statements could reasonably be read to indicate that Tuite was hired to provide "better representation" and that Aiuppa and his codefendants were required to pay a substantial retainer due to the risk of nonpayment of their legal bills. 358 Ill. App. 3d at 897. The belief that acquittal was a "done deal" and the "semijubilant" reaction after hiring Tuite could reasonably be construed to mean that the codefendants had complete faith in Tuite and they were elated at the thought of being represented by the best attorney available. 358 Ill. App. 3d at 898. The appellate court concluded that the statements, considered in the context of the book as a whole, were reasonably subject to this innocent construction. 358 Ill. App. 3d at 898. Thus, the appellate court held that the complaint failed to state a claim of defamation *per se*. 358 Ill. App. 3d at 899.

The appellate court also held that Tuite's false light invasion of privacy claim was dependent upon the establishment of a claim of defamation *per se*. 358 Ill. App. 3d at 899. Thus, the failure of Tuite's defamation *per se* cause of action resulted in the dismissal of his false light invasion of privacy claim. 358 Ill. App. 3d at 899. The appellate court further held that the disputed statements were not sufficiently extreme and outrageous to support a cause of action for intentional infliction of emotional distress. 358 Ill. App. 3d at 900.

Justice Wolfson disagreed with the majority's conclusion that the statements were subject to a reasonable innocent construction. 358 Ill. App. 3d at 901 (Wolfson, J., specially concurring in part and dissenting in part). In Justice Wolfson's view, "[t]he clear message is that Tuite was ready and able to fix the case, that he was paid to fix it, and that he did not deliver, something that should have caused a premature end to his life. It takes more than a 'strain' to apply an innocent meaning to the offending words. It takes a gyration of Olympian proportion." 358 Ill. App. 3d at 901 (Wolfson, J., specially concurring in part and dissenting in part). Justice Wolfson would have reversed the dismissal of the defamation *per se* and false light invasion of privacy counts and remanded for further proceedings. 358 Ill. App. 3d at 902 (Wolfson, J., specially concurring in part and dissenting in part).

-6-

We granted Tuite's petition for leave to appeal. 177 Ill. 2d R. 315(a). We then allowed the Chicago Tribune Company, the Chicago Sun-Times, Inc., ABC, Inc., WLS Television, Inc., CBS Broadcasting, Inc., Simon & Schuster, Inc., the Chicago Reader, Inc., Crain Communications, Inc., the Copley Press, Inc., and the Illinois Broadcasters Association to file an *amicus curiae* brief in support of defendants. 155 Ill. 2d R. 345. We allowed AIDA, Inc., to file an *amicus curiae* brief in support of Tuite. 155 Ill. 2d R. 345.

## II. ANALYSIS

Tuite argues that the appellate court erred in finding the statements in Double Deal capable of a reasonable innocent construction. Tuite also urges this court to abandon the innocent construction rule and replace it with the "reasonable construction rule." Based on these contentions, Tuite seeks reinstatement of his claims of defamation *per se* and false light invasion of privacy. Tuite does not challenge the dismissal of his claim of intentional infliction of emotional distress. We will first consider Tuite's argument that the innocent construction rule should be abandoned.

### A. The Innocent Construction Rule

A statement is defamatory if it tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person. *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558, 579 (2006). Statements may be considered defamatory *per se* or defamatory *per quod*. *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 10 (1992). A statement is defamatory *per se* if its defamatory character is obvious and apparent on its face and injury to the plaintiff's reputation may be presumed. *Owen v. Carr*, 113 Ill. 2d 273, 277 (1986). In a defamation *per quod* action, damage to the plaintiff's reputation is not presumed. Rather, the plaintiff must plead and prove special damages to recover. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 103 (1996). Here, plaintiff only alleges a claim of defamation *per se*.

In Illinois, there are five categories of statements that are defamatory *per se*: (1) statements imputing the commission of a crime; (2) statements imputing infection with a loathsome communicable

-7-

disease; (3) statements imputing an inability to perform or want of integrity in performing employment duties; (4) statements imputing a lack of ability or that otherwise prejudice a person in his or her profession or business; and (5) statements imputing adultery or fornication. *Solaia Technology,* 221 Ill. 2d at 579-80, citing *Van Horne v. Muller*, 185 Ill. 2d 299, 307 (1998). However, even if a statement falls into one of the categories of words that are defamatory *per se*, it will not be actionable *per se* if it is reasonably capable of an innocent construction. *Bryson*, 174 Ill. 2d at 90.

The innocent construction rule originated in Illinois from *obiter dictum* in *John v. Tribune Co.*, 24 Ill. 2d 437 (1962). See *Chapski v. Copley Press*, 92 Ill. 2d 344, 347 (1982), citing *Valentine v. North American Co. for Life & Health Insurance*, 60 Ill. 2d 168, 172 (1974) (Ward, J., dissenting, joined by Underwood, C.J., and Schaefer, J.). In *John*, this court stated:

> "We further believe the language in defendant's articles is not libelous of plaintiff when the innocent construction rule is consulted. That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." *John*, 24 Ill. 2d at 442.

Twenty years after *John* was decided, this court reconsidered the innocent construction rule in *Chapski*. We acknowledged that the rule had "been applied in dozens of appellate court cases, but in something less than a completely uniform fashion [citations] and often over vigorous objections concerning its application or whether it continues to be a fair statement of the law." *Chapski*, 92 Ill. 2d at 348. We also noted that application of the rule had not been entirely consistent in this court and that the rule had been subject to much critical commentary. *Chapski*, 92 Ill. 2d at 349. We further recognized that the innocent construction rule, or a variation of that rule, was recognized in only a few states. *Chapski*, 92 Ill. 2d at 349 (citing *Monnin v. Wood*, 86 N.M. 460, 525 P.2d 387 (1974), *Walker v. Kansas City Star Co.*, 406 S.W.2d 44 (Mo. 1966), *Steffes v. Crawford*, 143 Mont. 43, 386 P.2d 842 (1963), *Becker v. Toulmin*, 165 Ohio St. 549, 138 N.E.2d 391 (1956), and *Tulsa Tribune Co. v. Kight*, 174 Okla. 359, 50 P.2d 350 (1935)).

We observed that one of the early justifications for the rule was that it mitigated the harshness of strict liability that existed in defamation law prior to *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). *Chapski*, 92 Ill. 2d at 350. The strongest rationale for the rule, however, was that it comported with the constitutional interests of free speech and free press and encouraged the robust discussion of daily affairs. *Chapski*, 92 Ill. 2d at 350, citing *Dauw v. Field Enterprises, Inc.*, 78 Ill. App. 3d 67, 71 (1979). The primary criticism of the rule was that courts had a tendency to strain to find an unnatural innocent meaning for a statement when an innocent construction was clearly unreasonable and a defamatory meaning was far more probable. *Chapski*, 92 Ill. 2d at 350-51.

This court concluded that a modification of the innocent construction rule was warranted "[g]iven the inconsistencies, inequities and confusion that are now apparent from the interpretations and applications of the rule as originally announced in *John*, and the broader protections that now exist to protect first amendment interests [citations], together with the availability of the various privileges [citations]." *Chapski*, 92 Ill. 2d at 351-52. This court, therefore, held that:

> "[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*." *Chapski*, 92 Ill. 2d at 352.

This preliminary determination is a question of law to be resolved by the court; whether the statement was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury if the initial determination is resolved in the plaintiff's favor. *Chapski*, 92 Ill. 2d at 352, citing *Troman v. Wood*, 62 Ill. 2d 184, 189 (1975).

This court addressed the innocent construction rule again in *Mittleman v. Witous*, 135 Ill. 2d 220, 232 (1989), observing that "the law of defamation in general–and the innocent construction rule in particular–has spawned a morass of case law in which consistency and harmony have long ago disappeared." Nevertheless, we did not abandon the innocent construction rule. Instead, we clarified that

courts should not balance a reasonable innocent construction of a statement with a reasonable defamatory construction. *Mittleman*, 135 Ill. 2d at 232. Rather, statements reasonably capable of an innocent construction should be interpreted as nondefamatory. *Mittleman*, 135 Ill. 2d at 232. This court also held that the innocent construction rule applies only to *per se* actions. *Mittleman*, 135 Ill. 2d at 232. We acknowledged that the innocent construction rule favors defendants in *per se* actions, but found the tougher standard warranted in those cases because damages are presumed. *Mittleman*, 135 Ill. 2d at 234.

Subsequently, in *Bryson*, this court stressed that "[o]nly *reasonable* innocent constructions will remove an allegedly defamatory statement from the *per se* category." (Emphasis in original.) *Bryson*, 174 Ill. 2d at 90, citing *Kolegas*, 154 Ill. 2d at 11; *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402 (1988). We further explained that:

> "In applying the innocent construction rule, courts must give the allegedly defamatory words their natural and obvious meaning. [Citations.] Courts must therefore interpret the allegedly defamatory words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader. [Citation.] When a defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibellous under the innocent construction rule." *Bryson*, 174 Ill. 2d at 93.

Thus, the innocent construction rule does not require courts to strain to find an unnatural innocent meaning for a statement when a defamatory meaning is far more reasonable. *Bryson*, 174 Ill. 2d at 94. The rule also does not require courts "to espouse a naïveté unwarranted under the circumstances." *Bryson*, 174 Ill. 2d at 94.

It is apparent that the innocent construction rule has been clarified on several occasions by this court in response to difficulties in application. Notably, the rule has been retained despite those difficulties and is now well established, with a long history in this state. Tuite's request that we abandon the innocent construction rule necessarily implicates principles of *stare decisis*.

The doctrine of *stare decisis* expresses the policy of courts to stand by precedent and to avoid disturbing settled points. *People v. Sharpe*, 216 Ill. 2d 481, 519 (2005), quoting *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81-82 (2004). This doctrine ensures that the law will not change erratically, but will develop in a principled and intelligible fashion. *Sharpe*, 216 Ill. 2d at 519, quoting *Vitro*, 209 Ill. 2d at 81-82. *Stare decisis* allows the people and the bar of this state to rely upon the decisions of this court with assurance that they will not be lightly overruled. *Sharpe*, 216 Ill. 2d at 519, quoting *Vitro*, 209 Ill. 2d at 81-82. Thus, any departure from *stare decisis* must be specially justified. *Sharpe*, 216 Ill. 2d at 520, quoting *Vitro*, 209 Ill. 2d at 81-82.

Prior decisions of this court should not be overruled absent good cause or compelling reasons. *Sharpe*, 216 Ill. 2d at 520, quoting *Vitro*, 209 Ill. 2d at 81-82. This court will not depart from precedent merely because the court might have decided otherwise if the question were a new one. *Sharpe*, 216 Ill. 2d at 520, quoting *Vitro*, 209 Ill. 2d at 81-82. A settled rule of law that does not contravene a statute or constitutional principle should, therefore, be followed unless serious detriment prejudicial to public interests is likely to result. *Sharpe*, 216 Ill. 2d at 520, quoting *Vitro*, 209 Ill. 2d at 81-82. Good cause to depart from *stare decisis* also exists when governing decisions are unworkable or are badly reasoned. *Sharpe*, 216 Ill. 2d at 520, citing *People v. Jones*, 207 Ill. 2d 122, 134 (2003).

Tuite argues that this court should abandon the innocent construction rule for several reasons. First, Tuite asserts that the rule has been rejected in most other jurisdictions and that there is no sound policy reason to retain it. Tuite also argues that various protections and privileges have developed rendering the rule unnecessary. Tuite further contends that the innocent construction rule improperly eliminates the role of the jury in determining whether a statement has a defamatory meaning. According to Tuite, if the trial court finds there is no reasonable innocent construction for a statement, the plaintiff should then be entitled to a judgment as a matter of law because no jury could reasonably find the statement nondefamatory. Tuite also argues that the rule cannot be reconciled with the standards to be applied to a section 2–615 motion to dismiss. Tuite asserts that, contrary to section 2–615, the innocent construction rule requires the factual allegations and inferences surrounding the statement to be

viewed in a light most favorable to the defendant because any reasonable innocent construction must be accepted even if a more reasonable defamatory construction exists. Lastly, Tuite argues that despite the efforts in *Chapski* and *Bryson* to clarify the rule, it continues to be misapplied by Illinois courts.

Based on these arguments, Tuite asks this court to abandon the innocent construction rule and adopt the "reasonable construction rule" in its place. Tuite asserts that the reasonable construction rule, applied in a majority of jurisdictions, strikes the proper balance by requiring the trial court to determine whether the disputed statement is reasonably capable of a defamatory construction. If the statement is reasonably capable of a defamatory construction, the jury decides whether it was intended or understood to be defamatory. Tuite argues that the reasonable construction rule insulates the judicial system from frivolous claims without eliminating the role of the jury.

In *Chapski*, this court considered many of the objections to the innocent construction rule that are now raised by Tuite. We acknowledged that the innocent construction rule, or a variation thereof, was recognized in only a few states. See *Chapski*, 92 Ill. 2d at 349. We also considered "the broader protections that now exist to protect first amendment interests [citations] together with the availability of the various privileges." *Chapski*, 92 Ill. 2d at 351 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), *Colson v. Stieg*, 89 Ill. 2d 205, 209 (1982), *Blair v. Walker*, 64 Ill. 2d 1 (1976), *Farnsworth v. Tribune Co.*, 43 Ill. 2d 286 (1969), *Zienfeld v. Hayes Freight Lines, Inc.*, 41 Ill. 2d 345 (1968), *Catalano v. Pechous*, 83 Ill. 2d 146, 167-68 (1980), and Restatement (Second) of Torts §§ 583 through 613 (1977)). We, nevertheless, chose only to modify the rule in light of these considerations rather than abandon it. *Chapski*, 92 Ill. 2d at 351-52.

Tuite cites three cases that were decided after *Chapski* in support of his argument that new protections have rendered the innocent construction rule unnecessary. Tuite asserts that *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990), held a defamatory statement must be factual rather than mere hyperbole or unverifiable opinion to be actionable. The Supreme

Court, however, previously stated in *Gertz* that expressions of opinion are constitutionally protected. The Court asserted that "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*, 418 U.S. at 339-40, 41 L. Ed. 2d at 805, 94 S. Ct. at 3007. In *Milkovich*, the Court clarified that there is no artificial distinction between opinion and fact, and that a false assertion of fact can be defamatory even if it is couched in terms of an opinion. *Bryson*, 174 Ill. 2d at 99-100, citing *Milkovich*, 497 U.S. at 18-19, 111 L. Ed. 2d at 17-18, 110 S. Ct. at 2705-06. Under *Milkovich*, a statement is constitutionally protected only if it cannot be reasonably construed as stating actual facts. *Bryson*, 174 Ill. 2d at 100, quoting *Milkovich*, 497 U.S. at 20, 111 L. Ed. 2d at 19, 110 S. Ct. at 2706. Nonetheless, the constitutional protection of statements of opinion was recognized in *Gertz*. See *Solaia Technology*, 221 Ill. 2d at 581 (quoting *Gertz* as support for the proposition that a statement may be constitutionally protected as an expression of opinion). In *Chapski*, this court considered the "broader protections" provided in *Gertz* in modifying the innocent construction rule. *Chapski*, 92 Ill. 2d at 351-52.

Tuite also cites *Kuwik v. Starmark Star Marketing & Administration, Inc.*, 156 Ill. 2d 16, 24 (1993), for the proposition that qualified privileges protect defamation defendants from liability even when the allegedly defamatory statement is untrue. But in *Chapski* this court considered the availability of various qualified privileges in deciding to modify the innocent construction rule. *Chapski*, 92 Ill. 2d at 351. Thus, the existence of qualified privileges does not support a decision to abandon the rule now.

In addition, Tuite notes that defamation plaintiffs must prove that defamatory speech is false when seeking damages against a media defendant for speech that is of public concern. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77, 89 L. Ed. 2d 783, 793, 106 S. Ct. 1558, 1564 (1986). This constitutional protection was not considered in *Chapski*. Tuite, however, does not specifically explain how this protection replaces the function served by the innocent construction rule.

As previously noted, the innocent construction rule applies only to *per se* actions. *Mittleman*, 135 Ill. 2d at 232. While the rule favors defendants, the tougher standard is warranted because damages are

-13-

presumed in *per se* actions. *Mittleman*, 135 Ill. 2d at 234. We are not persuaded that the constitutional protections and privileges cited by Tuite supplant the innocent construction rule. We therefore reject Tuite's argument that the innocent construction rule should be abandoned on this basis.

As for Tuite's argument that the innocent construction rule eliminates the jury's role in determining the meaning of a statement, this court addressed that claim in *Chapski*. We held that the preliminary determination of whether a statement is capable of a reasonable innocent construction is a question of law to be resolved by the court in the first instance. *Chapski*, 92 Ill. 2d at 352. Whether the statement was in fact understood to be defamatory is a question for the jury if the initial determination is resolved in the plaintiff's favor. *Chapski*, 92 Ill. 2d at 352. Thus, the innocent construction rule does not eliminate the role of the jury as Tuite claims. This argument does not provide good cause or a compelling reason for this court to depart from *stare decisis*.

We also observe no conflict between the innocent construction rule and the standards applied to a section 2–615 motion to dismiss. A section 2–615 motion to dismiss attacks the legal sufficiency of a complaint based on facial defects. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 364 (2004). All well-pleaded facts and reasonable inferences that can be drawn from those facts are accepted as true. *Bryson*, 174 Ill. 2d at 86. The court is to interpret the allegations in the complaint in the light most favorable to the plaintiff. *Wakulich v. Mraz*, 203 Ill. 2d 223, 228 (2003). A cause of action should not be dismissed under section 2–615 unless it is clear that no set of facts can be proved under the pleadings that would entitle the plaintiff to recover. *Canel v. Topinka*, 212 Ill. 2d 311, 318 (2004).

In considering a section 2–615 motion to dismiss a defamation *per se* claim, the court must accept as true the facts alleged in the complaint, including the defendant's publication of a statement. The court is not, however, required to accept the plaintiff's *interpretation* of the disputed statement as defamatory *per se*. The meaning of the disputed statement is not a fact that can be alleged and accepted as true. Thus, the preliminary construction of the statement "is properly a question of law to be resolved by the court in the first instance." *Chapski*, 92 Ill. 2d at 352. In construing the statement under the

innocent construction rule, the court must "give the allegedly defamatory words their natural and obvious meaning" and interpret them "as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 174 Ill. 2d at 93. Contrary to Tuite's contention, in applying the rule the court does not construe the factual allegations in the light most favorable to the defendant. Rather, the court determines the legal question of the preliminary construction of the statement. We, therefore, find no conflict between the innocent construction rule and section 2–615.

Tuite's final contention in support of his argument that the innocent construction rule should be abandoned is that the rule continues to be misapplied. Since the rule was last clarified in *Bryson*, the appellate court has applied it in several cases. Tuite has not identified any specific case since *Bryson* that he claims misapplied the rule. We note that this court did find the appellate court erred in applying the innocent construction rule in one recent case. See *Solaia Technology*, 221 Ill. 2d at 582-83. That does not provide a basis for finding the rule unworkable, however, because any rule of law is subject to occasional misapplication. In *Bryson*, decided just 10 years ago, this court chose to clarify the innocent construction rule rather than to abandon it. We will not now abandon the rule as unworkable absent evidence that it has been subject to more than an occasional misapplication following its clarification.

In sum, this court has held that the innocent construction rule advances the constitutional interests of free speech and free press and encourages the robust discussion of daily affairs. *Chapski*, 92 Ill. 2d at 350, citing *Dauw*, 78 Ill. App. 3d at 71. The rule applies only to claims of defamation *per se*, and it is justified due to the presumption of damages. *Mittleman*, 135 Ill. 2d at 234. A plaintiff can always avoid application of the innocent construction rule by seeking to establish a *per quod* action. *Mittleman*, 135 Ill. 2d at 233. We conclude that the rationale underlying the rule remains valid. Tuite has not established the good cause or compelling reason required for this court to depart from *stare decisis*. Accordingly, we reject Tuite's request to abandon the innocent construction rule.

## B. Application of the Innocent Construction Rule

Tuite argues that the appellate court erred in finding that the disputed statements are capable of a reasonable innocent construction. As previously noted, the preliminary construction of an allegedly defamatory statement is a question of law. *Chapski*, 92 Ill. 2d at 352. Accordingly, our review is *de novo*. *Woods v. Cole*, 181 Ill. 2d 512, 516 (1998), citing *Lucas v. Lakin*, 175 Ill. 2d 166, 171 (1997).

In considering allegedly defamatory statements under the innocent construction rule, we reemphasize that courts must interpret the words "as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 174 Ill. 2d at 93. Courts are not required to strain to find an unnatural innocent meaning for words when a defamatory meaning is far more reasonable. *Bryson*, 174 Ill. 2d at 94. Thus, if the likely intended meaning of a statement is defamatory, a court should not dismiss the plaintiff's claim under the innocent construction rule. In those circumstances, an innocent construction of the statement would necessarily be strained and unreasonable because the likely intended meaning is defamatory. We also note that the innocent construction rule does not require courts "to espouse a naïveté unwarranted under the circumstances." *Bryson*, 174 Ill. 2d at 94.

Additionally, this court has emphasized that the context of a statement is critical in determining its meaning. See *Bryson*, 174 Ill. 2d at 93-94; *Mittelman*, 135 Ill. 2d at 247-48. A given statement may convey entirely different meanings when presented in different contexts. Thus, the innocent construction rule requires a writing "to be read as a whole." *John*, 24 Ill. 2d at 442. In this case, we must consider the entire book in determining the context of the allegedly defamatory statements. See *Flip Side, Inc. v. Chicago Tribune Co.*, 206 Ill. App. 3d 641, 651 (1990).

Double Deal is essentially a series of stories about mafia figures and their activities. A review of the book shows its context is organized crime and corruption in the Chicago area and Corbitt's involvement in those activities. As Tuite asserts, the book "recounts story after story of corruption, including within the judicial system." The disputed statements must be viewed in the context of the corruption described repeatedly throughout Double Deal.

Given the overwhelming focus on corruption in this book, these statements cannot reasonably be given an innocent construction. In the excerpt, defendants asserted that "the FBI had uncovered tons of evidence," and three of the key witnesses "knew enough to bury just about everybody who was anybody in the Outfit." Defendants asserted that additional witnesses were "flipping left and right" and "[i]t was pretty clear that the Chicago Outfit was going to take a major hit." These statements, if accurate, indicate that the evidence against Aiuppa and his codefendants was extremely strong.

According to the book, Tuite was then paid $1 million in cash to represent Aiuppa and his codefendants. After Tuite was hired, "all the guys were sort of semijubilant," they believed Tuite "had it all handled," and "it was like it was a done deal, like they were all going to be acquitted." In fact, Aiuppa and his codefendants were so confident that they would be acquitted in spite of the compelling evidence of their guilt that they were preparing to celebrate while waiting for the verdict. In the context of this book about crime and widespread corruption, these statements naturally indicate that Tuite was expected to engage in bribery or payoffs to secure the acquittals. We agree with Justice Wolfson that "[t]he clear message is that Tuite was ready and able to fix the case, that he was paid to fix it, and that he did not deliver, something that should have caused a premature end to his life." 358 Ill. App. 3d at 901 (Wolfson, J., specially concurring in part and dissenting in part).

Defendants, nonetheless, argue that terms such as "better representation," "retainer," "defense money," and "legal fees" in the excerpt indicate that Tuite was hired to provide legitimate legal services rather than to pay bribes. Defendants maintain that it is reasonable to accept the innocent construction that Tuite was hired on the basis of his legal skills. We disagree. The isolated use of those terms does not control the meaning of the excerpt. The context of the book as a whole significantly colors those terms. Importantly, this book is not about hiring a lawyer or complimenting Tuite's skills as an attorney. The book is a series of stories about corruption, including corruption within the judicial system. It is not reasonable to believe defendants intended to convey a story about Tuite's trial skills given the context of the book as a whole. It is far more reasonable to believe defendants intended to convey a story about corruption.

Defendants further argue that they *explicitly* accused other people of criminal misconduct in the book. Tuite, however, was not explicitly accused of bribing officials or any other criminal act. Defendants, therefore, contend that the excerpt is capable of a reasonable innocent construction.

We agree that Tuite was not explicitly accused of bribing officials in the excerpt. The excerpt, however, indicates that Aiuppa and his codefendants were facing virtually insurmountable evidence in their pending criminal trial. Nevertheless, after allegedly paying Tuite $1 million in cash from their illegal "skim," the criminal defendants considered their acquittals to be "a done deal." The question naturally arises as to how Tuite would ensure acquittals with certainty despite the "tons of evidence" against the criminal defendants. Although the book does not explicitly describe bribery as the means of achieving that result, it also does not mention or describe Tuite's trial skills as the basis for the criminal defendants' confidence in their acquittals. Based on the wording of the excerpt along with the context of the book as a whole, we believe that a reasonable reader would most likely conclude this passage was intended to allude to bribery and corruption of the judicial system. A reasonable reader would likely conclude that the delivery of $1 million in cash in illegally obtained funds was not solely for legitimate legal fees, but was, at least in part, to be used for bribes and payoffs to ensure the acquittals. There is simply no basis for a reasonable reader to believe that defendants implicitly intended to compliment Tuite's trial skills in the middle of a book about organized crime and corruption.

As noted, we will not strain to find an innocent meaning for words when a defamatory construction is far more reasonable. *Bryson*, 174 Ill. 2d at 94. We conclude that a defamatory construction of the disputed statements is far more reasonable than any innocent construction. An innocent construction is incompatible with the description of the events leading up to and following Tuite's hiring, as well as the events chronicled in the remainder of the book. Any innocent construction of these statements would be strained and unreasonable. See *Bryson*, 174 Ill. 2d at 94. Accordingly, we conclude that the appellate court erred in finding the disputed statements capable of a reasonable innocent construction.

Finally, Tuite's false light invasion of privacy claim was based upon the defamatory *per se* nature of the statements. The appellate

court held that the failure of Tuite's defamation *per se* claim required the dismissal of his false light claim. 358 Ill. App. 3d at 899. Because we reverse the dismissal of Tuite's defamation *per se* claim, it follows that the dismissal of his false light invasion of privacy claim must also be reversed.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the appellate court and the circuit court and remand this matter to the circuit court for further proceedings consistent with this opinion.

*Reversed and remanded.*

CHIEF JUSTICE THOMAS and JUSTICE BURKE took no part in the consideration or decision of this case.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I agree with the majority that it is appropriate to reverse the circuit court's order dismissing the case. However, I would arrive at that conclusion by a different route than the majority, because I respectfully dissent from that portion of the majority opinion which reaffirms the "innocent construction rule."

While I strongly believe in the doctrine of *stare decisis*, I do not believe its application in this case is proper for several reasons. First, the innocent construction rule is, in my view, out of step with the first amendment jurisprudence of the United States Supreme Court. Second, I find compelling plaintiff's arguments–which I do not believe this court ever to have addressed–that the innocent construction rule is inherently flawed. The fact that the rule has been rejected by an overwhelming majority of jurisdictions reinforces my belief. This court's own inconsistent application of the rule also demonstrates the flaws inherent therein, and suggests that the need exists for this court to revisit the question of the rule's continued place in our case law.

To my mind, these facts together constitute sufficient cause for *stare decisis* to yield. *Stare decisis* is a valid and useful rule of thumb, but as we have long acknowledged, it is not an "inexorable command." *Chicago Bar Ass'n v. Illinois State Board of Elections*,

161 Ill. 2d 502, 510 (1994). Rather, it is a means to the end of "ensur[ing] that the law will not merely change erratically, but will develop in a principled and intelligible fashion." *Chicago Bar Ass'n*, 161 Ill. 2d at 510. Prior decisions should not be overruled absent "good cause" (*Moehle v. Chrysler Motors Corp.*, 93 Ill. 2d 299, 304 (1982)), but good cause exists when the prior decision in question proves to be unworkable or badly reasoned (*People v. Sharpe*, 216 Ill. 2d 481, 520 (2005), citing *People v. Jones*, 207 Ill. 2d 122, 134 (2003)). Nor, we have noted, does it do violence to *stare decisis* to overrule a prior decision which the court has been quietly disavowing since its inception. See *People v. Mitchell*, 189 Ill. 2d 312, 339 (2000) (" 'explicitly overruling [a prior decision] is not an "erratic" change in the law. In the eighteen years since [that case], every case interpreting [it], including today's majority opinion, has eroded its holding. I would merely make explicit what this court has done implicitly for the last eighteen years' "), quoting *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 518 (1998) (Heiple, J., specially concurring).

A brief review of the history of the innocent construction rule is in order. We initially adopted the rule in 1964, in *John v. Tribune Co.*, 24 Ill. 2d 437 (1962). There, we stated in "*obiter dictum*" (*Chapski v. Copley Press*, 92 Ill. 2d 344, 347-48 (1982)) that

> "the language in defendant's articles is not libelous of plaintiff when the innocent construction rule is consulted. That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law." *John*, 24 Ill. 2d at 442.

We did not offer any rationale for adopting the rule, despite the fact that we had made Illinois an outlier by doing so. See, *e.g.*, Comment, *The Illinois Doctrine of Innocent Construction: A Minority of One*, 30 U. Chi. L. Rev. 524 (1963). Commentators subsequently recognized that the rule could have the beneficial effect of mitigating the doctrine of strict liability in the law of defamation (30 U. Chi. L. Rev. at 538-39), but that doctrine was abolished 10 years after *John*, over 30 years prior to the present day. *Chapski*, 92 Ill. 2d at 350, citing *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974).

Approximately 20 years after *John*, this court decided *Chapski.* There, we debated whether to persist with the innocent construction rule. Recognizing that the rule had been applied in wildly divergent ways by our appellate court, the strongest argument this court could muster in defense of the innocent construction rule was "that it comports with the constitutional interests of free speech and free press and encourages the robust discussion of daily affairs." *Chapski*, 92 Ill. 2d at 350, citing *Dauw v. Field Enterprises, Inc.*, 78 Ill. App. 3d 67, 71 (1979). Nevertheless, we also acknowledged in *Chapski* that since *John* had been decided, there had come broader general protection for first amendment interests. *Chapski*, 92 Ill. 2d at 351 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974), and *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964) (abolishing doctrine of strict liability for both private and public plaintiffs, respectively)). We also recognized the existence of "various privileges" protective of free speech. *Chapski*, 92 Ill. 2d at 351 (citing *Colson v. Stieg*, 89 Ill. 2d 205, 209 (1982), *Catalano v. Pechous*, 83 Ill. 2d 146, 167-68 (1980), *Blair v. Walker*, 64 Ill. 2d 1 (1976), *Farnsworth v. Tribune Co.*, 43 Ill. 2d 286 (1969), *Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill. 2d 345 (1968), and Restatement (Second) of Torts §§583 through 613 (1977)). We accordingly concluded that the rule's protection was sufficiently less compelling that we could modify the rule as announced in *John* to clarify that

> "a written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se*. This preliminary determination is properly a question of law to be resolved by the court in the first instance; whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff." *Chapski*, 92 Ill. 2d at 352, citing *Troman v. Wood*, 62 Ill. 2d 184, 189 (1975).

We have applied the rule numerous times since *Chapski* but have never since explicitly modified it. See, *e.g.*, *Solaia Technology, LLC v. Specialty Publishing Co.*, 221 Ill. 2d 558 (2006); *Bryson v. News*

-21-

*America Publications, Inc.*, 174 Ill. 2d 77, 90, 93 (1996); *Kolegas v. Heftel Broadcasting Corp.*, 154 Ill. 2d 1, 11 (1992); *Mittelman v. Witous*, 135 Ill. 2d 220 (1989); *Costello v. Capital Cities Communications, Inc.*, 125 Ill. 2d 402 (1988). Nor have we, since *Chapski*, expressly addressed any challenge to the rule, so far as I am aware.

The first reason that I believe *stare decisis* must yield in this case is that the innocent construction rule is out of step with United States Supreme Court precedent involving defamation and the first amendment's protection of free speech. It is outdated. That is not to say that "robust discussion of daily affairs" (*Chapski*, 92 Ill. 2d at 350) has become passé, but as the Supreme Court has long recognized, free speech is not the only societal interest at issue in defamation actions. "If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation." *Gertz*, 418 U.S. at 341, 41 L. Ed. 2d at 806, 94 S. Ct. at 3007. Rather, that interest is in tension with the individual's interest in maintaining his good name against defamatory falsehood. *Gertz*, 418 U.S. at 341, 41 L. Ed. 2d at 806, 94 S. Ct. at 3008. Thus, the simple fact that the innocent construction rule favors free speech (see slip op. at 15, citing *Chapski*, 92 Ill. 2d at 350) is not sufficient reason to prefer it.

Moreover, as first amendment jurisprudence has evolved, the United States Supreme Court has provided a great deal of additional protection to free speech which did not exist at the time of *John* or *Chapski*. *Sullivan* and *Gertz* were, of course, landmark cases in defamation law which were decided after *John* but before *Chapski*. They did away with the doctrine of strict liability in defamation actions, and we took them into account when we modified the rule in *Chapski*. See *Chapski*, 92 Ill. 2d at 351. But the Court has announced numerous significant decisions since *Chapski*, as plaintiff notes in his brief to this court. For instance, the Court has ruled that when the speech at issue concerns a matter of public importance, the burden is on the plaintiff to prove the speech false (rather than truth being an affirmative defense which the defendant must raise and prove) even when the plaintiff is not a public figure. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776, 89 L. Ed. 2d 783, 792, 106 S. Ct. 1558, 1563 (1986). The Court has erected an absolute bar to recovery for any speech which cannot "reasonably have been interpreted as

stating actual facts" about a public figure. *Hustler Magazine v. Falwell*, 485 U.S. 46, 50, 99 L. Ed. 2d 41, 48, 108 S. Ct. 876, 879 (1988). And, as the majority recognizes, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990), wrought yet another change in defamation law. There, the Court disavowed the statement in *Gertz* that "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas" (see *Gertz*, 418 U.S. at 339-40, 41 L. Ed. 2d at 805, 94 S. Ct. at 3007) as mere "*dictum*" which was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.' " *Milkovich*, 497 U.S. at 18, 111 L. Ed. 2d at 17, 110 S. Ct. at 2705. Rather, *Milkovich* clarified, the question is whether the statement is "provable as false," at least with respect to speech on matters of public concern involving a media defendant. *Milkovich*, 497 U.S. at 19-20, 111 L. Ed. 2d at 18, 110 S. Ct. at 2706.

A comprehensive dissertation on defamation law since 1964 is well beyond the scope of this partial dissent. But what is apparent even from the above cursory survey is that a number of factors come into play in balancing free speech concerns against the rights of the individual against defamation. The calculus turns on such variables as whether the plaintiff is a public figure, whether defendant is a member of the media, and the degree of public interest in the subject matter of the allegedly defamatory speech at issue. Although some of these permutations had been settled at the time *Chapski* was decided, not all had.

What is further apparent is that the innocent construction rule is blind to all of the above distinctions. We have applied the rule when the defendant is a member of the media (*Solaia Technology*, 221 Ill. 2d 558 (trade magazine); *Bryson*, 174 Ill. 2d 77 (national magazine)) and when the defendant is a private individual (*Mittelman*, 135 Ill. 2d 220 (member of board of directors of plaintiff's law firm)). The rule is in equal force when the plaintiffs are public figures (*Catalano v. Pechous*, 83 Ill. 2d 146 (1980) (city aldermen)) and when the plaintiff is a private individual (*Bryson*, 174 Ill. 2d 77 (private individual living in a small town in southern Illinois)). Nor does my review of our case law evince any attempt to take into account the degree of public interest in the subject matter of the speech at issue. The rule is wholly insensitive to the complex context-sensitive balance between the

public's interest in free speech and the individual's interest in his good name, unsullied by falsehood. So far as I can see, the innocent construction rule is nothing more than a thumb on the scale on the side of the defendant in every *per se* defamation case. It is out of step with the delicate balances inherent in defamation law and this alone constitutes sufficient reason to overrule it, *stare decisis* notwithstanding.

My second basis for finding cause to depart from *stare decisis* deals with the very operation of the innocent construction rule. Not only is it out of step with defamation law generally–a sledgehammer where a scalpel is called for–it is intrinsically logically flawed and inconsistent with our general standards applicable at the dismissal stage of lawsuits. The majority purports to address these concerns, but I believe it falls short.

Plaintiff argues that by its terms, the innocent construction rule does away with the role of the jury, and he is correct. According to the rule, at the dismissal stage, the court must answer the threshold question of whether, as a matter of law, a statement can reasonably be read innocently. If the answer is yes–*i.e.*, the statement *can* be read innocently–the case never goes to a jury. Only if the answer is no–*i.e.*, the statement *cannot* reasonably be read innocently–does the case proceed. That is, a jury will only be allowed to decide whether a statement was actually innocent or defamatory if the court has already decided *as a matter of law* that the statement *cannot reasonably be read innocently*. *Chapski*, 92 Ill. 2d at 352. No jury finding in favor of a defendant should be allowed to stand, given that for the case to get to the jury, the court must already have found as a matter of law that the statement cannot reasonably be read innocently.

As plaintiff notes in his brief, commentators have described this flaw in the rule for decades. Shortly after *Chapski*, commentators noted:

> "The primary flaw in the innocent construction rule is its illogical method for determining which statements are to be nonactionable as a matter of law and which are to be sent to a jury. Under the rule as applied in *John*, allegedly defamatory words capable of being read innocently must be so read and declared nonactionable by the judge as a matter of law. Therefore, only those statements which the court determines are incapable of any innocent construction are to be sent to the

-24-

jury for a determination of whether they were understood to be defamatory. Under this procedure, however, if a judge determines that no innocent construction exists, there is nothing left for the jury to determine. In theory, though apparently not in actual practice, the plaintiff should then be entitled to judgment as a matter of law. Alternatively, the judge should be compelled to enter a directed judgment or judgment notwithstanding the verdict if the issue is submitted to the jury and the jury determines otherwise." L. Malone & R. Smolla, *The Future of Defamation in Illinois after Colson v. Stieg and Chapski v. Copley Press, Inc.*, 32 DePaul L. Rev. 219, 277 (1983).

The same fact was observed just prior to *Chapski*:

"[T]here should never be a jury trial in Illinois on the nature of the words. For, if the words are reasonably capable of innocent meaning, the trial judge should dismiss the case. The only other kind of case will be a situation in which the words are not capable of any reasonably innocent meaning. Therefore, the trial judge should enter a judgment for the plaintiff, at least on the meaning of the words, because no reasonable jury by definition could ever find the words to be innocent." M. Polelle, *The Guilt of the "Innocent Construction Rule" in Illinois Defamation Law*, 1 N. Ill. U. L. Rev. 181, 214 (1981).

Indeed, commentators have been making the same observation since *John*:

"If literally applied, [the innocent construction rule] would seem practically to eliminate the jury from the determination of the defamatory quality of ambiguous language. If the words are capable of an innocent construction, the defendant is entitled to a directed verdict. If there is no innocent construction that can be derived from the publication then there is no question of fact as to its defamatory character, and it should be declared defamatory as a matter of law. Either way there would be no question to be submitted to the jury." 30 U. Chi. L. Rev. at 531.

See also R. Smolla, Law of Defamation 2d §4.22, at 4–38.8 (1999) (noting that the innocent construction rule, "which is often internally

contradictory, confusing, and on the whole significantly biased in favor of defendants, has produced some bizarre results, and has come in for substantial criticism").

The majority suggests that we answered this objection in *Chapski*. See slip op. at 13-14. I respectfully disagree. In *Chapski* we never professed to address the argument that the rule did away with the jury's role. It is not clear the argument was even raised in the case, despite the objection having been voiced by commentators since the rule's inception. To the contrary, the only argument against the rule which we acknowledged in *Chapski* was that when applying it, courts failed to interpret statements reasonably. *Chapski*, 92 Ill. 2d at 350-51. Moreover, even if the argument was raised in *Chapski* and rejected *sub silentio*, the response is that then, as now, a majority of this court failed to come to grips with the heart of the objection. To say that the case goes to the jury if it has not been dismissed is technically true, but the point of the objection is that once a case has survived dismissal under the innocent construction rule there is *nothing left for the jury to decide*, because the court must already have ruled as a matter of law that it would be unreasonable to interpret the statements as anything but defamatory.

Plaintiff also argues that the rule is inconsistent with the standards we otherwise apply at the dismissal stage. Again, plaintiff's point is well-taken. As the majority correctly summarizes, at the dismissal stage "[A]ll well-pleaded facts and reasonable inferences that can be drawn from those facts are accepted as true." Moreover, "[t]he court is to interpret the allegations in the complaint in the light most favorable to the plaintiff," dismissing the cause of action only if "it is clear that no set of facts can be proved under the pleadings that would entitle the plaintiff to recover." Slip op. at 14. The majority reasons that the innocent construction rule is consistent with these principles because although "the court must accept as true the facts alleged in the complaint," the court "is not, however, required to accept the plaintiff's *interpretation* of the disputed statement as defamatory *per se*. The meaning of the disputed statement is not a fact that can be alleged and accepted as true." (Emphasis in original.) Slip op. at 14. Rather, the court " 'give[s] the allegedly defamatory words their natural and obvious meaning' and interprets them 'as they appeared to have been used and according to the idea they were intended to

-26-

convey to the reasonable reader.' " Slip op. at 14, quoting *Bryson*, 174 Ill. 2d at 93.

This recitation of the rules ordinarily applicable at the dismissal stage and what occurs pursuant to the innocent construction rule seems to me sufficient to demonstrate the incompatibility to which plaintiff directs our attention. I agree with the majority that it would be inappropriate to treat the plaintiff's interpretation of a statement as a fact which must be assumed to be true. However, if the meaning of a statement is not a "fact" to be "alleged," then how is the trial court to arrive at a conclusion regarding the statement's meaning? Clearly, the court must *interpret* the statement, *inferring* its meaning from the context in which it was made. And thus, by the rules the majority cites, any doubt regarding the statement's meaning should be resolved in plaintiff's favor. See slip op. at 14 ( "All well-pleaded facts and reasonable *inferences* that can be drawn from those facts are accepted as true. [Citation.] The court is to *interpret* the allegations in the complaint in the light most favorable to the plaintiff" (emphases added)). But under the innocent construction rule, no preference is given for that interpretation of the statement which support's plaintiff's complaint. To the contrary, any doubt about the statement's meaning is resolved in the *defendant*'s favor because if the defendant's interpretation of the statement is reasonable, the case is dismissed. This is not an appropriate standard at the dismissal stage.

To say it another way, the innocent construction rule comes into play when there are two reasonable ways in which a statement could be interpreted, one of which is defamatory and one of which is not. In such a situation, the court is required to dismiss the action rather than allowing the case to go to the jury. This is clearly different than all other civil actions, in which, at the dismissal stage, if there are two reasonable ways to resolve a factual dispute, one favoring plaintiff and the other favoring defendant, the court must deny the motion to dismiss, sending the case to the jury to resolve the factual dispute. The majority's statement that the rule does not require a court to "construe the factual allegations in the light most favorable to the defendant" is, again, technically true but misses the thrust of the argument. A court does not have to draw inferences in the defendant's *favor*, because according to the innocent construction rule, the entire *case* must be decided in defendant's favor as a matter of law if the defendant's position is even *reasonable*. Plaintiff's point is that in all cases except

-27-

defamation, the question at the dismissal stage is, Is it reasonably possible that the plaintiff will be able to prove his case? If so, the case must proceed. In defamation, by contrast, the question is, Is it reasonably possible that the plaintiff's case could fail? If so, the case must be dismissed without the plaintiff ever having the opportunity to put his case before a jury of his peers.

By contrast, the reasonable construction rule suffers none of these defects. Application of the reasonable construction rule requires a court at the dismissal stage to determine whether there is any reasonable way to interpret the statement in a defamatory manner. If the statement can reasonably be so interpreted, the case proceeds, and the jury must ultimately determine if the statement was actually defamatory. Only if it is not reasonably possible to interpret the statement as defamatory is the case dismissed. Slip op. at 12; see also *James v. Gannett Co.*, 40 N.Y.2d 415, 419, 353 N.E.2d 834, 837-38, 386 N.Y.S.2d 871, 874 (1976). This rule comports with our normal rules applicable at the dismissal stage, and leaves a question for the jury to decide if the case does actually go to the jury.

I believe that these inherent flaws in the rule constitute another sufficient reason to abandon it despite *stare decisis*. See *Sharpe*, 216 Ill. 2d at 519; *Jones*, 207 Ill. 2d at 134 (good cause to overrule a prior decision exists when the prior decision is unworkable or badly reasoned). I see no indication that this court has ever considered these deficiencies in the rule. We certainly did not do so in *John*, where we adopted the rule in *dictum* in one paragraph with no analysis, nor did we do so in *Chapski*, where the only challenge we addressed was the fact that courts applying the rule interpreted statements unreasonably, nor in any other decision applying the rule. The rule is badly reasoned and illogical, and should be done away with for this reason alone, let alone the fact that it is also badly out of step with evolving defamation and first amendment jurisprudence.

Another virtue of the reasonable construction rule is that it is followed by the *vast* majority of jurisdictions. The Restatement and Dobbs both state simply that it is the judge's function to determine whether the words are capable of being understood as defamatory, and the jury determines whether they were actually defamatory. Restatement (Second) of Torts §614, at 311 (1977); 2 D. Dobbs, Torts §404, at 1131 (2001). Neither even mentions another approach. A leading treatise says that the reasonable construction rule has been

adopted by "every jurisdiction in the United States save Illinois." R. Smolla, Law of Defamation 2d §4.21, at 4–38.5 (1999). But see R. Sack, Sack on Defamation §2.4.14, at 2–62-2–63 (3d ed. rev. 2004) (innocent construction rule is the law not only in Illinois but also in "Ohio and, perhaps, in Missouri, New Mexico, and Montana"). Some jurisdictions, such as New York, appear always to have followed the reasonable construction rule (see, *e.g.*, *James*, 40 N.Y.2d at 419, 353 N.E.2d at 837-38, 386 N.Y.S.2d at 874), while others, such as California, once followed the innocent construction rule but abandoned it in favor of the reasonable construction rule (*MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536, 343 P.2d 36 (1959)).

I would not necessarily find our uniqueness alone to be sufficient reason to abandon our prior precedent. I believe it is no vice to hold fast to a well-reasoned rule, even if other jurisdictions do not agree. But in this case, I believe the rule Illinois follows is *not* well reasoned, and its almost universal rejection by our sister States tends to support that view.

Finally, I note that the innocent construction rule has been fraught with inconsistency since its inception. Our modification of the rule in *Chapski* provides one example of this, of course. Moreover, despite this court's express statement in *Chapski* that our holding there "modified" the rule as announced in *John*, we have been inconsistent about whether *Chapski* did in fact modify the rule. Compare, *e.g.*, *Bryson*, 174 Ill. 2d at 93 (parenthetically characterizing *Chapski* as "modifying" *John*), with *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 416 (1996) (" 'it is hardly tenable that prior to *Chapski* an innocent construction could be *unreasonable*. In short, a *reasonable* innocent construction was always the mandate of *John v. Tribune Co.* and was applied in the numerous defamation cases which are *John*'s progeny' " (emphases in original)), quoting *Harris Trust & Savings Bank v. Phillips*, 154 Ill. App. 3d 574, 581 (1987). Yet another apparent inconsistency may be observed within the instant case. The majority cites approvingly the holding in *Mittelman* that we do not "balance" differing constructions of the statement at issue. See slip op. at 9-10, citing *Mittelman*, 135 Ill. 2d at 232. Yet in applying the rule in this case the majority "conclude[s] that a defamatory construction is far *more reasonable* than any innocent construction." (Emphasis added.) Slip op. at 18.

The innocent construction rule was adopted, in *dictum*, at a time when defamation was a strict liability cause of action, with little protection for the speaker. Since then, not only has strict liability been entirely repudiated, but defamation law has become increasingly complex, taking into account the status of both parties involved as well as the nature of the speech at issue. But the innocent construction rule has remained unchanged, a simple blanket layer of protection for defendants no matter what the circumstance. Moreover, even if the law had not changed, the rule has from its inception been logically flawed and inconsistent with our general rules concerning motions to dismiss. It has been repudiated by all, or nearly all, other jurisdictions in the country. Further, this court has had to amend the rule in the past, and continues to apply it inconsistently. For all these reasons, in this case, I believe that *stare decisis* should yield, and the innocent construction rule should at long last be consigned to its rightful place in the scrap heap of Illinois legal history. Accordingly, I respectfully dissent from this portion of the majority opinion.

However, I agree with the result reached by the majority. For if we were to adopt the reasonable construction rule, as I advocate, I would conclude that it is reasonably possible to interpret the statements at issue in a defamatory fashion. Thus according to that rule the appropriate resolution of this case would be to reverse and remand for further proceedings, the same result the majority reaches through its application of the innocent construction rule. Accordingly, I concur in the majority's result.